# IN THE SUPREME COURT OF IOWA

No. 15–1515

Filed June 23, 2017

**STATE OF IOWA,**

Appellee,

vs.

**EDDIE TIPTON,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Jeffrey Farrell, Judge.

Defendant seeks further review of his conviction for one count of attempting to fraudulently pass or redeem a lottery ticket and one count of tampering with lottery equipment. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

Dean Stowers of Stowers & Sarcone, PLC, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis Sloven, Kevin Cmelik, and Robert Sand, Assistant Attorneys General, for appellee.

**APPEL, Justice.**

In this case, Eddie Tipton challenges his felony convictions on two lottery-related offenses. The convictions arose out of the drawing of a Hot Lotto jackpot winner with a prize of $16.5 million on December 29, 2010. The State claimed Tipton engaged in a technologically sophisticated 21st Century crime, while the defense characterized the State's version of events as derived from *Mission: Impossible.*[1]

On January 15, 2015, over four years after the lottery drawing in question, the State charged Tipton with fraudulently passing or redeeming, or attempting to pass or redeem, a lottery ticket in violation of Iowa Code section 99G.36(1) (2011). The State also charged Tipton with influencing or attempting to influence the winning of the prize through fraud, deception, or tampering with lottery equipment or materials in violation of Iowa Code section 99G.36(2).

Tipton moved to dismiss both charges, arguing they were untimely because the three-year statute of limitations provided in Iowa Code section 802.3 had expired. The district court denied the motion. According to the district court, both the fraudulent passing or redeeming and the tampering charges against Tipton were continuing offenses under Iowa Code section 802.7. The last act of the offenses, according to the district court, occurred on January 17, 2012. As a result, the district court reasoned, the fraudulent passing and redeeming and the tampering charges were timely brought on January 15, 2015.

In the alternative, the district court concluded the one-year fraud extension of the statute of limitations provided in Iowa Code section

---

[1]A popular film series of action spy thrillers based on a television series of the same name. *See* Mission: Impossible (Paramount 1996, 2000, 2006, 2011, 2015); Mission: Impossible (CBS 1966–1973) (ABC 1988–1990).

802.5 applied to the charges. The court concluded both crimes involved fraud, and as a result, the statute of limitations could be extended for one year after the State discovered or should have discovered the crimes. The court further reasoned discovery occurs only when the State knew or should have known there was probable cause that Tipton committed the offenses. The court found the State developed probable cause that Tipton was involved in the crimes only after the State released a video of the person who purchased the winning ticket online in October 2014, and Tipton was identified as a suspect by a lottery employee in Maine who watched the video. The court further found the State exercised reasonable diligence in its investigation and discovery of Tipton's involvement in the crimes. As a result, the court concluded on this alternate ground that the State timely initiated its prosecution against Tipton.

A jury convicted Tipton of both the fraudulent passing or redeeming and the tampering charges. Tipton appealed, claiming his prosecution on both charges was barred by the three-year statute of limitations, the jury's verdict on both charges was not supported by substantial evidence, the trial court made prejudicial errors in the admission of evidence, and the jury was improperly instructed on various issues.

We transferred the case to the court of appeals. The court of appeals ruled that the fraudulent passing, redeeming, and tampering charge was not a continuing offense under Iowa Code section 802.7. With respect to the one-year extension of the statute of limitations for fraudulent acts under Iowa Code section 802.5, the court held the State was on notice of fraudulent passing or redeeming as early as November, and no later than December 29, 2010, when the lottery ticket was

presented for payment. As a result, even if the one-year extension applied, the fraudulent passing or redeeming charge was untimely.

With respect to the tampering charge, however, the court of appeals came to a different conclusion. The court concluded the tampering was only discovered in October 2014, and as a result, the tampering charge was timely. Because the evidence regarding discovery was undisputed, the court concluded no jury issue was present.

Turning to other issues, the court of appeals held there was substantial evidence to support the jury's verdict on the tampering charge. The court also found no reversible error in the evidentiary ruling and jury instruction issues related to the tampering charge.

Tipton sought further review, which we granted. For the reasons expressed below, we vacate the decision of the court of appeals and affirm in part and reverse in part the judgment of the district court.

## I. Factual and Procedural Background.

**A. Events Leading to Filing of Charges.** The Iowa Lottery (lottery) offers a multistate lottery game called "Hot Lotto." Winning numbers are selected by one of two random number generator (RNG) computers. Prior to each drawing, officials flip a coin to determine which RNG computer will be used to select the winners for that drawing.

Winning Hot Lotto tickets must be claimed within a year of purchase or the prize is forfeited. Iowa Code § 99G.31(2)(*b*), (*d*); Iowa Admin. Code r. 531—11.2 (2010); *id.* § 531—20.13; Iowa Lottery, *Iowa Lottery Game Specific Rules: Hot Lotto* r. 531—20.13, at 5 (Dec. 31, 2007), https://web.archive.org/web/20101206230827/http://www.ialottery.com/PDF/GameRules/HotLotto_Rules.pdf. The lottery will not pay the prize on a winning ticket if the ticket was not validly purchased, legally

presented, or legally possessed or acquired. Iowa Code § 99G.31(2)(*e*); Iowa Admin. Code r. 531—11.3.

On December 23, 2010, someone purchased a Hot Lotto ticket from a Des Moines convenience store and won the jackpot of the Hot Lotto drawing on December 29. The Hot Lotto jackpot for that drawing was $16.5 million. The lottery knew where and when the winning ticket was purchased because of its tracking system. Video and audio equipment at the convenience store recorded the purchase of the winning ticket.

No one presented the ticket and attempted to claim the prize until November 2011. On November 10, Phillip Johnston, a resident of Quebec, Canada, contacted the lottery and claimed he bought the winning ticket. While Johnston was able to provide the lottery with the fifteen-digit security number printed on the back of the ticket, he provided details of the purchase to the lottery that did not match the video and audio recording of the purchaser. The lottery did not pay the prize to Johnston.

On December 6, Johnston admitted he was not the owner of the ticket and instead represented an anonymous owner. Johnston discussed with the lottery whether the ticket could be claimed through a Belizean blind trust, Hexham Investments Trust. The trustee for Hexham was New York attorney Crawford Shaw. Johnston was president of Hexham Investments, Ltd., the primary beneficiary of the trust.

On December 29, Julie McClean, a local attorney representing Shaw, presented the winning ticket along with a winning claim form to lottery officials. The ticket and claim were submitted on behalf of the trust and the ticket was signed by Shaw in his capacity as trustee for the

trust. The ticket was submitted a little more than one hour before the lottery's one-year deadline. From December 29 on, the winning ticket remained in possession of lottery officials.

Shaw and McClean met with lottery officials on January 17, 2012. The purpose of the meeting was to find a resolution to get the claim paid. According to McClean,

> Our position was that the trust had presented all of the information that was available to it to satisfy the requirements of the Iowa Lottery Authority, and that they had their own investigative powers and other means to satisfy their other requirements.

While recognizing the regulatory powers of the lottery, McClean and Shaw took the position that the lottery could pay out the claim based on information provided, together with other information which would be available through the lottery's security protocols. McClean and Shaw also suggested the money could be paid to charity.

The lottery declined to pay the prize. On January 26, local counsel for Shaw sent the lottery a letter unconditionally withdrawing the claim of ownership of the lottery ticket.

The lottery asked the Iowa Division of Criminal Investigation (DCI) to help investigate claims for the winning lottery ticket on November 15, 2011. The DCI interviewed Johnston in Quebec City, Canada. After they interviewed Johnston, DCI agents traveled to Houston, Texas, in an attempt to interview Robert Sonfield and Robert Rhodes. Over a three-day period, DCI agents made various attempts to talk with Sonfield and Rhodes but were unsuccessful.

On October 9, 2014, the DCI released a portion of the video and audio recording of the purchase of the winning ticket at the Des Moines convenience store in the hopes of receiving a tip as to the identity of the

purchaser. On October 15, the DCI received a tip from an employee of the Maine lottery that Edward Tipton was the purchaser.

Tipton was a security expert employed by the Multi-State Lottery Association (MUSL), a vendor of the lottery that provides services for the organization and administration of lottery games in Iowa and other states. *See* Iowa Code § 99G.3(18) (defining vendor). Tipton wrote the RNG program that produced the winning number combinations for a variety of lottery games, including Hot Lotto.

As an employee of the lottery, Tipton was ineligible to play the lottery. *See id.* § 99G.31(2)(*h*). While it is not a crime for an employee to play the lottery, employees are told they will not be paid the prize if they do play and win.

DCI investigators interviewed Tipton on November 7, 2014. Tipton claimed he did not purchase the winning ticket. He further said he was visiting family in Houston, Texas, on December 23, 2010, the day the ticket was purchased. Additional investigation showed Tipton was a friend and former work colleague of Rhodes.

The DCI also learned Tipton was knowledgeable about "rootkits," which could be used to rig the Hot Lotto's random number generators to produce predictable numbers. A rootkit is software that can alter the functioning of a computer. Tipton had told a coworker he knew how to install a self-destructing rootkit onto a machine. Tipton also had spoken about rootkits as a security threat to lotteries at a national conference.

Security records showed Tipton accessed the RNG computers on November 20, 2010, to perform the routine daylight savings time clock change on the computers. On November 20, the draw-room security camera was malfunctioning. The camera recorded only about one second out of every minute. As a result, the video of Tipton's activities in

the draw room where the RNG computers were housed was incomplete. Other employees in the draw room did not observe Tipton do anything unusual but testified at trial that they relied upon Tipton's computer expertise.

The DCI further discovered the two RNG computers in operation in December 2010 were, in the ordinary course of business, retired and completely "wiped" at some point prior to the investigation. The 2010 RNG computers were not connected to the Internet and thus the only way to install a rootkit on one would be to manually do so by connecting hardware to the computer, such as by a thumb drive.

Tipton was charged with two crimes by information filed on January 15, 2015. Count I charged Tipton with fraudulent passing or redeeming a lottery ticket under Iowa Code section 99G.36(1). Specifically, Count I stated,

> During the time period of December 2010 through January 17, 2012, in Polk County, IA, the defendant did, with intent to defraud, falsely utter, pass, or redeem a lottery ticket or attempted to falsely utter, pass, or redeem a lottery ticket, in violation of Iowa Code § 99G.31(2)(h) and § 99G.36(1), a class "D" felony.

In Count II, Tipton was charged with attempting to influence the winning of a prize through use of fraud or deception, or tampering with lottery equipment in violation of Iowa Code section 99G.36(2). Specifically, Count II stated,

> During the time period of December 2010 through January 17, 2012, in Polk County, IA, the defendant influenced or attempted to influence the winning of a prize through the use of fraud or deception, or tampering with lottery equipment or materials, in violation of Iowa Code § 99G.31(2)(h) and § 99G.36(2), a class "D" felony.

### B. Pretrial Proceedings Before the District Court.

1. *Motion to dismiss on statute of limitations grounds.* Tipton filed a motion to dismiss due to expiration of the three-year statute of limitations in Iowa Code section 802.3 under Iowa Rule of Criminal Procedure 2.11(6)(*a*). Tipton argued that fraudulent passing or redeeming under Iowa Code section 99G.36(1) and tampering under section 99G.36(2) are not continuing offenses. Further, Tipton argued, the State in its minutes of evidence did not allege he had any involvement with Shaw or local counsel representing Shaw, who met with lottery officials as late as January 17, 2012, in an attempt to negotiate payment of the lottery ticket. As a result, Tipton asserted, Iowa Code section 802.7 relating to the statute of limitations for continuing offenses had no application.

Tipton further asserted the one-year fraud extension of the statute of limitation after discovery of the offense under Iowa Code section 802.5 did not apply. According to Tipton, while the charges against him "do have an element of fraud, they were discovered more than one year prior to the filing of the indictment." Tipton argued the one-year statute commences to run when the State is put on inquiry notice and is aware of "a problem." Tipton reasoned the latest anyone could have attempted to redeem the lottery ticket was one year after the purchase, or December 29, 2011. On that date, Tipton pointed out, the signed ticket and a claim form were presented to the lottery. Tipton recognized that later, on January 17, 2012, Shaw again met with lottery officials seeking payment. But, according to Tipton, the State did not allege in the minutes of evidence that he had any involvement with Shaw or McClean. Because the State was on notice of both charges by December 29, 2011,

Tipton asserted the charges were untimely filed and could not be saved by a one-year extension under Iowa Code section 802.5.

With respect to Count II, Tipton argued even if there was evidence of tampering to lottery computers, the tampering would had to have been made prior to the December 29, 2010 lottery drawing when the winning ticket was drawn. As a result, Tipton asserted, the three-year statute of limitations in Iowa Code section 802.3 expired well before the filing of the tampering charge.

Finally, Tipton argued, the one-year fraud extension expired by the time of the indictment because the State discovered or should have discovered the crime more than one year prior to January 15, 2015. Tipton asserted the State knew, or should have known that a crime occurred when Johnston claimed to be the owner of the ticket in November 2011, but could not accurately describe the circumstances of the ticket's purchase. Tipton argued authorities also should have known in January 2012, when Shaw withdrew his claim to the ticket, that a criminal fraud had been committed. According to Tipton, the fact the State waited until October 2014 to release the video and audio recording shows they were not diligent in their efforts to investigate.

The State filed a resistance and a brief in opposition to Tipton's motion to dismiss. Citing Iowa Code section 802.7, the State argued Tipton set in motion "a series of acts" which began with his purchasing of the winning Hot Lotto ticket and passing the ticket to his friend and former coworker Rhodes. According to the State's theory, Rhodes and Sonfield in turn passed the ticket to Johnston and Shaw with instructions to claim the proceeds but not identify the purchaser under any circumstances. The State noted on January 17, 2012, Shaw met with lottery officials in a last attempt to redeem the ticket. As a result,

the State asserted the charges were filed "within three years of the last series of acts on which the offense was based." The State also argued, in any event, at least one of the acts alleged occurred within the period of the statute of limitations, namely, Shaw's attempt to redeem the ticket on January 17, 2012.

Alternatively, the State argued the prosecution was timely under Iowa Code section 802.5. The State notes Iowa Code section 802.5 provided a one-year extension for crimes for "any offense a material element of which is either fraud or a breach of fiduciary obligation." The State argued that under Iowa Code section 802.5 the statute of limitations was extended for one year after the discovery on October 15 that Tipton may have purchased the winning ticket. As a result, the State argued its filing of charges approximately three months after October 15 was timely.

The district court held a hearing on the motion to dismiss. The State called Matthew Anderson as a witness at the hearing. Anderson was a DCI agent who was assigned to work on the case on November 15, 2011. Anderson reported the DCI file in this case consisted of over 300 files and hundreds of pages of documents.

Anderson testified about interviewing Johnston in Quebec and about the difficulty he had working with Canadian authorities on identifying Johnston. Some communications from Canadian authorities were in French, and although a Phillip Johnston was identified, it was the wrong Phillip Johnston. After a couple of months, the United States Department of Justice advised the DCI to cease contact with Canadian officials until an application had been completed. Anderson stated he tried for several weeks to complete the twenty to twenty-five-page application but was unable to do so. According to Anderson, the

application required a finding of probable cause, and since Iowa authorities did not have probable cause, the application was not filed. Eventually, however, Anderson got approval to fly to Canada to talk with Johnston. The interview, according to the minutes, occurred in August 2013.

Thereafter, Anderson testified he traveled to Houston to attempt to interview Sonfield and Rhodes. The minutes reveal this effort occurred in June 2014, approximately ten months after the interview with Johnston. Anderson did not explain the reasons for the ten-month delay in seeking to interview Sonfield and Rhodes.

Anderson was asked why the DCI waited until October 2014 to release the portion of the video and audio recording. According to Anderson,

> We held onto that for basically being able to vet and verify our false leads that continued to come in, that still continue to come in. People would call in and say, Well, I pulled up in a red vehicle, or, I was wearing this. Mr. Phillip Johnston claimed to be wearing a suit when he purchased the ticket. So that piece of evidence was a key—a key, known fact in our investigation that we were not willing to compromise.

Anderson further testified the tactic of withholding evidence in order to sift through later claims or evidence was a common law enforcement tactic which makes the investigation more efficient because some false claims can be eliminated out of hand.

On cross-examination, Anderson was asked why the video and audio recording was not released after the one-year period for redeeming lottery tickets had expired. The following colloquy occurred:

> Q: I'm a little confused about what you're saying, the calling to claim it, because the time for filing claims for the winnings had expired in December of 2011. So what were you concerned people would call to claim about that video

after that time? A: Your question is multifaceted there. The first concern is not that they would claim it. However, we already started investigation where there's obviously deceit in the original claim that there is a lie.

The problem from that is people, society, does not understand that just because the year expired that they can't make the claim or that they won't win the claim, which, again, I would suppose is going to be a legal argument if they can somehow show that they were defrauded of this ticket. Which during this investigation, until all the pieces came together, was one of the concerns, that possibly somebody had become deceased in the transaction of this ticket. We didn't know. So that was not obviously off the table. So it— just to dismiss—I would not dismiss that video as a common piece of evidence, and that is why it was held.

The district court denied Tipton's motion to dismiss. The court ruled both the fraudulent passing and redeeming and the tampering charges were continuing offenses under Iowa Code section 802.7. According to the court, the offenses continued at least until January 17, 2012, when Shaw and McLean met with lottery officials, thereby making the trial information filed on January 15, 2015, timely. The court reasoned both counts were committed in furtherance of a fraudulent effort to claim the Hot Lotto prize and the initial acts were only pieces in the chain of the crime culminating in the final attempt to claim the prize on January 17, 2012.

In the alternative, the district court ruled the State was entitled to the one-year fraud extension under Iowa Code section 802.5. The court noted there was no serious dispute that fraud was an element of each offense. The court concluded the one-year fraud extension was triggered only when the State learned Tipton, an employee of MUSL, purchased the ticket. The court explained there was no probable cause to believe fraud occurred until the purchaser of the ticket was identified as a MUSL employee in October 2014. According to the court, prior to October 2014, the State had a suspicion of fraud, but no probable cause. The

court further concluded the State had been reasonably diligent in its investigation. The court found the State's decision to release the video in October 2014 was based on the legitimate purpose to hold back details related to the purchase from the public so its investigation would not be hampered by false claims and tips.

2. *Further pretrial motions before the district court.* Tipton also filed a motion in limine to suppress, among other things, the "actions and silence of Sonfield and Rhodes." Evidence Sonfield and Rhodes made themselves unavailable, Tipton argued, was not evidence of anything against him. There could be multiple possible reasons, Tipton suggested, Sonfield and Rhodes avoided speaking to investigators. This evidence, Tipton concluded, was not probative, invited speculation, and was unfairly prejudicial.

The State responded the evidence simply showed responsive conduct by law enforcement. The district court overruled the motion and allowed the evidence into the record at trial.

Shortly before trial, the State filed a motion in limine to prevent Tipton from offering evidence that lottery computers in operation after December 2010 showed no signs of tampering or the use of a rootkit. The State asserted the evidence was irrelevant to the issues at trial. Tipton noted the State must have thought the evidence relevant since they had conducted the forensic tests.

The district court sustained the motion in limine. At trial, Tipton made an offer of proof. The court adhered to its prior position, and the evidence was not admitted.

3. *Challenges to jury instructions.* Tipton raised four challenges to the proposed jury instructions. He sought instructions for the jury to use in determining statute of limitations issues, sought additional

language related to concepts of speculation and conjecture, and sought an instruction that passing and redeeming were two separate offenses and could not be charged as if they were a continuing offense. Additionally, Tipton argued the instruction on the meaning of "attempt" was inadequate.

Tipton proposed instructions to allow the jury to determine factual issues related to the applicable statutes of limitations, including whether the State acted with due diligence sufficient to allow for Iowa Code section 802.5's one-year fraud extension to provide a basis for late filed information. The court declined to give Tipton's proposed instructions.

Tipton's second challenge related to Instruction No. 5. Instruction No. 5 was a stock instruction of the Iowa State Bar Association. Instruction No. 5 provided,

> In considering the evidence, make deductions and reach conclusions according to reason and common sense. Facts may be proved by direct evidence, circumstantial evidence, or both. Direct evidence is evidence from a witness who claims actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is evidence about a chain of facts which show a defendant is guilty or not guilty. The law makes no distinction between direct evidence and circumstantial evidence. Give all the evidence the weight and value you think it is entitled to receive.

Tipton sought to add the following language: "Facts are not proven by evidence that require[s] speculation or conjecture, or merely raises a suspicion, however." The State resisted on the ground that Instruction No. 5 was a standard instruction. The district court declined to give Tipton's proposed instruction.

Tipton's third challenge was to Instruction No. 20. Instruction No. 20 gave one instruction on the passing or attempting to redeem the

lottery ticket charge.[2]  Tipton argued this instruction permitted each member of the jury to find the defendant committed a different instance of passing or attempting to redeem the ticket without agreeing between them on any one instance and thus deprived Tipton of his right to a unanimous jury verdict and due process.  The State asserted Count I was a continuing offense, and so the instruction was proper.  The court agreed with the State.

Tipton's fourth challenge was to Instruction No. 32.  In Instruction No. 32, the district court instructed the jury that the term "attempt" means "to try to do something."  Tipton objected to the instruction and proposed a much more elaborate instruction.

**C. Trial Proceedings.**  Fighting issues at trial included whether Tipton, in fact, was the person purchasing the winning Hot Lotto ticket and whether Tipton could have possibly tampered with the RNG computers that selected the December 29, 2010 Hot Lotto jackpot winner.

A number of the State's witnesses identified Tipton as the purchaser of the winning Hot Lotto ticket on December 23, 2010, based on the video and audio recording of the purchase of the winning ticket. Michael Boardman, who worked as a marketing manager of the Maine lottery and who responded to the published video and audio release in October 2014, testified Tipton was the purchaser.  Boardman identified Tipton as the person in the recording "[p]rimarily because . . . his voice on the video . . . is very distinct, very recognizable, very characteristic." Boardman also found "the way he moved and shuffled around in his

---

[2]By the time of trial, the State abandoned any claim Tipton "uttered" a lottery ticket under Iowa Code section 99G.36(1).

pockets to get things out" to be characteristic of Tipton. Boardman admitted, however, he could not visually identify the person in the video and when he called authorities in response to the video and audio recording, he stated cautiously that the possibility the person was Tipton "was something that needs to be investigated."

Kathleen Farnsworth-Cubit, who worked at the Iowa lottery and knew Tipton, testified the voice she heard on the recording "beyond any doubt whatsoever" was Tipton. Tipton, Farnsworth-Cubit testified, had a "very distinctive way of speaking." Like Boardman, Farnsworth-Cubit identified the defendant to authorities after the release of the video and audio recording of the purchase of the winning Hot Lotto ticket. On cross-examination, Farnsworth-Cubit stated the words "thank you" and "hello" led her to identify Tipton. But a transcript of the record suggested the convenience store clerk had said the "hello" and the customer in fact said "no thanks," not "thank you." Noelle Kruger and Kathy Renaud, both drawing managers at MUSL, also identified the audio on the recording as Tipton's voice. As with Farnsworth-Cubit, however, cross-examination revealed these witnesses did not remember the exact words Tipton spoke on the recording.

Ed Stefan, a friend of Tipton's who co-owned a patent with him, served as Chief Information and Security Officer for MUSL until April 2014. He testified regarding the video and audio recording,

> That's Eddie. But he's got like—why is he wearing a hoodie? I've never seen Eddie in a hoodie. Didn't know he had a black jacket. So it looks just like Eddie. It sounds just like Eddie. It acts just like Eddie. The mannerism are just like Eddie.

At his pretrial deposition, however, Stefan testified everything he knew about Tipton "screamed" the man in the recording could not be him. Yet,

witnesses Jason Maher, a network engineer for MUSL, and Chuck Strutt, a MUSL executive director, also identified Tipton from the recording.

Other witnesses testified as to Tipton's knowledge of lottery computer programs, security protocols, and rootkits. Stefan testified it would be possible for a person to install a rootkit on the RNG computers with a thumb drive and the rootkit could dictate the numbers chosen for the lottery in a fashion to evade security and integrity checks. Strutt testified Tipton had given presentations on rootkits and even kept some rootkit software on his MUSL computer. Maher testified Tipton developed the software that "actually picked the numbers for the Hot Lotto game," thus giving him knowledge of the software that would assist in the development of a rootkit to take control of the system. He also testified that the manner used to verify the RNG program's hash output—a digital security signature used to verify the program was not tampered with—would not check for rootkits.

Finally, the State offered testimony that Tipton had access to the RNG computers on November 20, 2010. According to the State's witnesses, when Tipton engaged in the time-change operation he had "full access, full control" over the RNG computers. Although there were ordinarily video recordings of the draw room where the RNG computers were kept, there was a malfunction in the security cameras, which resulted in only one second recorded out of every minute.

Tipton offered five witnesses. Mike Kirchner, a DCI employee, examined Tipton's cell phone records and came up with photos of Tipton as clean shaven, unlike the purchaser of the winning Hot Lotto ticket, who some witnesses believed appeared to be bearded.

Kathy Renaud, a MUSL employee, testified she was in the draw room on November 20, 2010, along with others and observed nothing

unusual. She testified that in order to reach the USB port on the RNG computers to download a program from a thumb drive, a person would have to extend a forearm down into the case. She also testified Tipton was clean shaven at the January 16, 2011 Christmas party. She did not recognize the person in the video purchasing the winning ticket as Tipton but believed the voice was his.

Three relatives of Tipton—his sister, younger brother, and another brother—generally testified the person in the video was smaller than Tipton. They also noted Tipton did not have a beard, with his younger brother testifying Tipton had bald spots on his cheeks and could not grow one.

The jury found Tipton guilty on both counts. He was sentenced to a five-year indeterminate prison sentence, each count to be served consecutively, for a total of ten years.

**D. Issues Raised on Appeal.** On appeal, Tipton raises a wide range of issues. He contends the district court erred in failing to dismiss the charges as untimely under Iowa Code section 802.3. He asserts the verdicts were not supported by substantial evidence. He claims the court erred in admitting testimony regarding the course of the investigation— evidence that Johnston cooperated and Sonfield and Rhodes declined to talk to investigators. Tipton also asserts the court erred in failing to allow him to introduce evidence that the RNG computers after December 29, 2010, did not appear to have been tampered with. Finally, Tipton challenges the failure to give his proposed instructions on the statute of limitations and Instruction Nos. 5, 20, and 24 on the same bases raised before the district court.

The court of appeals first considered whether fraudulent passing and redeeming and tampering were continuing offenses under Iowa Code

section 802.7. The court concluded they were not. As a result, the court concluded the State could not escape the three-year statute of limitations in Iowa Code section 802.3 on the ground that the crimes amounted to continuing offenses.

The court of appeals next turned to the question of whether the charges could be saved by operation of the one-year extension of the statute of limitations under Iowa Code section 802.5. With respect to the fraudulent passing and redeeming charge, the court concluded the State was on notice of such crimes by December 29, 2011, and as a result, the one-year statute did not save the charge from the operation of the three-year statute of limitations in Iowa Code section 802.3.

For the tampering count, however, the court of appeals came to a different conclusion. The court first determined the tampering charge had an element of fraud and thus the provisions of Iowa Code section 803.5 were applicable. The court found the State did not have any knowledge the crime of tampering had occurred until October 2014 when Tipton was identified from the video recording as the person purchasing the winning Hot Lotto ticket. As a result, the court concluded the tampering charge was timely.

The court of appeals further held there was substantial evidence supporting the tampering charge. Summarizing the evidence, the court emphasized a reasonable juror could have found Tipton, an experienced security employee of the MUSL, had drafted and edited the security policies associated with lottery ticket claims and developed the software for the program that actually picked the numbers for the Hot Lotto game. Further, the court held a jury could have found Tipton had extensive knowledge of rootkits, which could be used to rig the drawing. In addition, the court found a reasonable juror could have found that on

November 20, 2010, Tipton had access to the lottery computers that selected the winning numbers of the December 23 drawing. According to the court of appeals, a reasonable juror could have found that on November 20 Tipton had the opportunity to insert a thumb drive into the computer to install a rootkit on the system. Further, the court stressed, the fact that the purchaser of the winning ticket on December 23 purchased two tickets suggested the purchaser was aware the lottery had two computers and selected at random which computer would be used to pick the winning numbers. Based on this evidence, the court determined a reasonable juror could have concluded that Tipton tampered with the lottery computers in order to influence the outcome of the Hot Lotto drawing.

The court of appeals held the district court did not err in prohibiting the introduction of evidence that there were no instances of unauthorized or unaccounted for insertions of external drives or devices in lottery computers after December 2010. The court noted the State charged Tipton with tampering with the computers on a specific date, November 20, 2010, and there was no error in refusing to introduce evidence regarding the state of lottery computers after that date.

On the only instructional challenge related to the tampering charge, the court of appeals found no reason to reverse the conviction. The court noted with respect to Tipton's proposed additional language to Instruction No. 5 regarding speculation and conjecture, the district court did not err in its conclusion that the same information was included in other instructions.

**II. Statute of Limitations.**

**A. Introduction.**  This case raises six statute of limitations issues related to two crimes and three theories of extension of the statute of limitations time period.

Generally speaking, the purpose of a statute of limitations is to "prevent fraudulent and stale actions from arising after a great lapse of time while still preserving the right to pursue a claim for a reasonable period of time." *State v. Walden*, 870 N.W.2d 842, 845 (Iowa 2015) (quoting *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985)).  Criminal statutes of limitations are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Id.* (quoting *Toussie v. United States*, 397 U.S. 112, 114–15, 90 S. Ct. 858, 860 (1970)).  Statutes of limitations also may "have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Id.* at n.1 (quoting *Toussie*, 397 U.S. at 115, 190 S. Ct. at 860).  They provide "predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322, 92 S. Ct. 455, 464 (1971).  Inherent in a statute of limitations, however, is that their operation "may permit a rogue to escape." *Toussie*, 397 U.S. at 123, 90 S. Ct. at 865 (quoting *Pendergast v. United States*, 317 U.S. 412, 418, 63 S. Ct. 268, 271 (1943)).

Statutes of limitations have traditionally been "liberally construed in favor of criminal defendants."  5 Wayne R. LaFave, et al., *Criminal Procedure* § 18.5(a), at 210 (4th ed. 2015) [hereinafter LaFave].  We follow the prevailing view by resolving doubts in favor of the accused when

construing statutes of limitations.  *Id.*; *accord Walden*, 870 N.W.2d at 845; *State v. Francois*, 577 N.W.2d 417, 418 (Iowa 1998).  The State bears the burden of proof of demonstrating the charges are timely brought.  *State v. Howard*, 610 N.W.2d 535, 537 (Iowa Ct. App. 1999); *see also People v. Zamora*, 557 P.2d 75, 92 n.25 (Cal. 1976) (en banc); *City of Cleveland v. Hirsch*, 268 N.E.2d 600, 602 (Ohio Ct. App. 1971); *Commonwealth v. Hawkins*, 439 A.2d 748, 750 (Pa. Super. Ct. 1982).

**B. Standard of Review.**  We review claims that a charge should be dismissed because it was barred by the statute of limitations for correction of errors at law.  *State v. Burgess*, 639 N.W.2d 564, 567 (Iowa 2001); *see State v. Wilson*, 573 N.W.2d 248, 251 (Iowa 1998) (analyzing a statute-of-limitations issue for errors at law because "the proper meaning of a statute is a legal question").

**C. Relevant Statutory Provisions.**  The general statute of limitations for serious criminal offenses is provided in Iowa Code section 802.3.  It provides that an indictment or information for a felony or aggravated or serious misdemeanor "shall be found within three years after its commission."  Iowa Code § 802.3.  There are, however, two potentially applicable exceptions to the general three-year statute of limitations in Iowa Code section 802.3.

A potentially applicable exception to the generally applicable three-year statute of limitations is provided in Iowa Code section 802.7.  Under Iowa Code section 802.7, "[w]hen an offense is based on a series of acts committed at different times, the period of limitations prescribed by this division shall commence upon the commission of the last of such acts."

A second potentially applicable exception is Iowa Code section 802.5.  This exception to the generally applicable three-year statute of limitations provides, in pertinent part, "for any offense a material element

of which is . . . fraud," prosecution may be commenced after the expiration of the three-year statute of limitations if the prosecution begins "within one year after the discovery of the offense by an aggrieved party . . . but in no case shall this provision extend the period of limitation otherwise applicable by more than three years." *Id.* § 802.5.

### D. Positions of the Parties.

1. *Fraudulent passing or redeeming charge.* With respect to the fraudulent passing or redeeming charge, Tipton argues the lottery ticket in question was fraudulently passed and attempted to be redeemed no later than December 29, 2011. The three-year statute of limitations, Tipton argues, thus began to run on the date the crime was completed. *See Pendergast*, 317 U.S. at 418, 63 S. Ct. at 271; *United States v. Gonzales*, 495 F.3d 577, 580 (8th Cir. 2007); *State v. Kay*, 349 P.3d 690, 693–94 (Utah 2015). According to Tipton, subsequent acts after the offense charged may tend to prove the charge but cannot be used to extend the statute of limitations. *See Grunewald v. United States*, 353 U.S. 391, 401–02, 77 S. Ct. 963, 972 (1957). As a result, Tipton argues, the State's prosecution, which commenced on January 15, 2015, was untimely under Iowa Code section 802.3 and must be dismissed.

Tipton addresses the two possible statutory exceptions that might extend the time for bringing charges beyond the generally applicable three-year statute of limitations of Iowa Code section 802.3. With respect to the continuing offense exception of section 802.7, Tipton argues the crime of fraudulent passing or redeeming is not a continuing offense but is instead a crime based upon discrete acts. Tipton asserts Iowa Code section 802.7 has no application and cannot rescue the fraudulently passing or redeeming charge from the three-year limitation established in section 802.3.

With respect to the one-year statutory extension of the statute of limitations for fraud-type crimes in Iowa Code section 802.5, Tipton argues the State was on notice of the potential crime when Johnston attempted to redeem the ticket in November 2011 and the ticket was presented to the lottery on December 29, 2011. Tipton cites *Wilson* in support of his position. According to Tipton, *Wilson* stands for the proposition that the one-year fraud extension is triggered when the state is put on "inquiry notice" of the offense. 573 N.W.2d at 253. Tipton argues once a party is aware that a "problem" exists, the party has a duty to investigate. *Id.* Tipton reasons the pertinent date for triggering the one-year fraud extension is when the State was placed on notice of the need to investigate, not the date from which probable cause was actually developed. Tipton points to language in *Wilson* stating that discovery "occurs when the authorities know or should know in the exercise of reasonable diligence that there is probable cause to believe a criminal fraud has been committed." *Id.* at 254. According to Tipton, "sitting on, but not using, a critical piece of evidence for almost three years after suspecting fraud" is not diligent.

The State offers a multilayered response to Tipton's statute of limitations arguments. First, the State suggests the statute of limitations did not begin to run in this case until January 17, 2012. On that date, Shaw met with lottery officials in another effort to secure payment for the winning lottery ticket. According to the State, it is from this last act that the three-year statute of limitations should be measured. Under this theory, the criminal charge of fraudulent passing or redeeming brought on January 15, 2015, was within the three-year statute of limitations.

In the alternative, the State asserts the continuing offense exception in Iowa Code section 802.7 was fully applicable. According to

the State, fraudulent passing or redeeming a lottery ticket was a continuing offense that extended at least through January 17, 2012.

As a second alternative, the State argues the one-year statute of limitations extension in Iowa Code section 802.5 applies. According to the State, the crime of fraudulent passing and redeeming is the kind of crime that qualifies for the one-year extension. Further, according to the State, the one-year extension runs from October 2014, when Tipton was identified as a potential purchaser of the ticket. The State argues the one-year extension of the statute of limitations is triggered when the State knows, or in the exercise of reasonable diligence should have known, there is probable cause that a defendant has committed the crime. According to the State, it did not have probable cause that Tipton committed the crime of fraudulent passing and redeeming until he was identified as the purchaser after the release of the video in October 2014. Prior to that time, according to the State, there were obvious concerns about the transaction, but the State had no awareness of Tipton's involvement.

2. *Tampering with intent to influence.* Tipton argues the tampering charge arises from the allegation that on a specific date, namely, November 20, 2010, Tipton rigged the lottery's computers. According to Tipton, the crime was complete on this discrete date, thereby triggering the general statute of limitations in Iowa Code section 802.3. Because the prosecution commenced more than three years after the date the crime was complete, Tipton argues prosecution is barred.

With respect to the continuing offense exception to Iowa Code section 802.7, Tipton argues the charge of tampering is not a continuing offense under the statute. As with the fraudulent passing and redeeming

charge, Tipton claims the three-year statute of limitations began to run when the crime was complete.

Turning to the one-year extension for crimes contained in Iowa Code section 802.5, Tipton asserts the tampering offense does not fall within the scope of the statute because fraud is not an element of the offense as charged by the State in Count II of the trial information. Tipton emphasizes under the jury's instruction in this case, the State was not required to prove fraud, fraudulent intent, or deceit. Tipton notes while Iowa Code section 99G.36(2) contains a "use of fraud" alternative, this alternative was not submitted to the jury. Tipton asserts that in order for the one-year extension to apply, fraud must be one of the elements the State is required to prove.

Tipton further asserts even if the statute applies, the State was on inquiry notice no later than January 2012. By that time, Johnston had called the lottery falsely claiming to have purchased the winning ticket, the ticket had been presented to the lottery by lawyers representing a trust with the purchaser remaining undisclosed, and the claim was ultimately withdrawn on January 27. At this point, according to Tipton, the lottery officials were on inquiry notice that nefarious activity was involved with the December 23, 2010 Hot Lotto drawing.

In the alternative, even if the State was not on notice of the potential tampering until October 2014, when Tipton was identified as a potential purchaser of the winning ticket, Tipton argues the State may not invoke Iowa Code section 802.5 because its investigation was not diligent. According to Tipton, the one-year extension begins to run when the State knew or should have known of the facts indicating the offense of tampering may have been committed. Tipton asserts the State was

not diligent in delaying the release of the video until October 2014, almost three years after the crime of tampering was committed.

The State primarily argues the tampering charge is timely through operation of the continuing offense and one-year fraud extensions to the general statute of limitations. With respect to the continuing offense exception of the statute of limitations, Iowa Code section 802.7, the State argues the impact of tampering with the computers continued past November 20, 2010, until at least January 27, 2012, when Shaw withdrew the claim related to the lottery ticket.

In the alternative, the State asserts it is entitled to the benefit of the one-year fraud extension in Iowa Code section 802.5. The State asserts fraud is a material element of tampering. While the State concedes the jury instruction related to Count II did not include the word "fraud," the State suggests the very essence of the tampering charge is to influence the lottery and defeat its purpose in a fraudulent manner.

The State next argues, based on *Wilson,* the one-year fraud extension has two elements, a probable cause element and a due diligence element. 573 N.W.2d at 254. With respect to the probable cause element, the State asserts in order to trigger the statute, the State must know there is probable cause to believe that an offense has been committed *by a specific defendant.* The State argues it had no idea of Tipton's potential involvement until October 2014 when the lottery released the videotape showing the December 23, 2010 ticket purchase.

On the due diligence element, the State argues it was reasonable to withhold the release of the video until October 2014. According to the State, keeping the video confidential was important to the investigation in order to allow the State to properly investigate claims related to the purchase of the ticket. For example, the State notes it was able to

establish Johnston was not the original purchaser of the ticket because his description of what he was wearing on the day he allegedly purchased the ticket did not match the details evident in the video. According to the State, withholding certain facts about a crime in order to be in a position to better evaluate claims is a standard law enforcement technique. It was essential to keep the video secret for most of the investigation, the State asserts, because the information in the video was the only way the State had of disproving potential claims.

**E. Application of Continuing Offense Doctrine in Iowa Code Section 802.7.**

1. *Overview of the continuing offense doctrine.* Under Iowa Code section 802.7, "[w]hen an offense is based on a series of acts committed at different times, the period of limitations prescribed by this division shall commence upon the commission of the last of such acts." We have repeatedly held this provision is an expression of the continuing offense exception to the statute of limitations. *See Francois*, 577 N.W.2d at 421 (holding the crime of absence from custody is a continuing offense); *State v. Olson*, 249 Iowa 536, 552, 86 N.W.2d 214, 224 (1957) (holding the statute of limitations on a conspiracy does not begin to run until the last overt act is committed in furtherance of the conspiracy); *State v. Sloan*, 55 Iowa 217, 219, 7 N.W. 516, 517 (1880) (holding a bigamous marriage is a continuing offense so long as the couple continuously cohabitates); *see also* 21 Am. Jur. 2d *Criminal Law* § 248, at 381–82 (2016); 22A C.J.S. *Criminal Procedure and Rights of Accused* § 596, at 386–87 (2016); Jeffrey R. Boles, *Easing the Tension Between Statutes of Limitations and the Continuing Offense Doctrine*, 7 Nw. J.L. & Soc. Pol'y 219, 229 (2012) [hereinafter Boles].

The characterization of a crime as a continuous one rather than a crime based on discrete acts has an important consequence for the operation of statutes of limitations. When a crime involves discrete acts, the statute of limitations ordinarily begins to run at the moment when all the elements of the crime have been satisfied. *See* Boles, 7 Nw. J.L. & Soc. Pol'y at 229. With a continuous crime, however, the crime is not complete until the last related act is committed. *See generally* Andrew P. O'Shea, Note, *Criminal Law—An Embezzlement Intermezzo: Scheming to Side-Step* Toussie v. United States*'s Continuing Offense Test*, 35 W. New Eng. L. Rev. 249, 254–55 (2013) [hereinafter O'Shea].

An influential modern treatment of the continuing offense doctrine is *Toussie*, 397 U.S. 112, 90 S. Ct. 858. In *Toussie*, the defendant was convicted of failing to register for the draft. *Id.* at 112, 90 S. Ct. at 859. The question before the United States Supreme Court was whether the offense of failure to register for the draft was a continuing offense for purposes of the applicable statute of limitations. *Id.* at 114, 90 S. Ct. at 860.

The *Toussie* Court emphasized the general purposes of the statutes of limitations, noting that they protect individuals from defending themselves against charges obscured by the passage of time and may have a salutary effect by encouraging law enforcement to promptly investigate crime. *Id.* at 114–15, 90 S. Ct. at 860. The Court emphasized the doctrine of continuing offenses should "be applied in only limited circumstances" because of the tension between the purpose of the statute of limitations and the continuing offense doctrine. *Id.* at 115, 90 S. Ct. at 860.

In order to determine whether such limited circumstances were present, the *Toussie* Court developed a two-pronged test. *Id.* To find an

offense to be a continuing one, the Court held either "the explicit language of the substantive criminal statute [must] compel[] such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.* Although the Court stated the test it adopted should not mean a crime should never be construed as a continuing one, it is clear the *Toussie* test is quite demanding and requires great confidence that the legislature intended the statute of limitations to be avoided by such crimes. *See id.*; *see also* O'Shea, 35 W. New Eng. L. Rev. at 266.

Applying this test to failure to register for the draft, the *Toussie* Court noted there was no language in the underlying statute "clearly contemplat[ing] a prolonged course of conduct." 397 U.S. at 120, 90 S. Ct. at 863. Thus, the first prong of the test was not met. *Id.* at 121, 90 S. Ct. at 863. The Court then turned to the second prong, noting there is "nothing inherent in the act of registration itself which makes failure to do so a continuing a crime." *Id.* at 122, 90 S. Ct. at 864. According to the Court, unlike conspiracy, where each day's act presents a renewed threat of the substantive evil Congress sought to prevent, "draft registrations clearly were viewed as instantaneous events." *Id.*

The *Toussie* Court closed by emphasizing the fact that failure to register for the draft was not a continuing offense did not diminish the gravity of the underlying offense. *Id.* at 123, 90 S. Ct. at 864. Yet, the Court noted while Congress had imposed criminal penalties for failure to register for the draft, it also enacted a statute of limitations. *Id.* at 123, 90 S. Ct. at 864–65. The Court recognized "[e]very statute of limitations, of course, may permit a rogue to escape." *Id.* at 123, 90 S. Ct. at 865 (quoting *Pendergast*, 317 U.S. at 418, 63 S. Ct. at 271). But, the Court

emphasized, the congressional will reflected in the statute of limitations must be honored. *Id.* at 124, 90 S. Ct. at 865.

We considered the application of the continuing offense doctrine in *State v. Hippler*, 545 N.W.2d 568 (Iowa 1996). In *Hippler*, the defendant had stolen an automobile a week before being involved in a collision causing injuries to a driver that terminated her pregnancy. *Id.* at 569. Hippler was charged with nonconsensual termination of a pregnancy under Iowa Code section 707.8(1). *Id.* at 570. An element of the crime of nonconsensual termination is the termination occurs "during the commission of a felony." *Id.* (quoting Iowa Code § 707.8(1) (1993)). The question thus arose whether Hippler, who was driving an automobile stolen prior to the accident and charged with theft by exercising control over stolen property, was engaged in a continuous offense at the time of the accident. *Id.*

We rejected the application of the continuing offense theory in *Hippler*. *Id.* at 573. The *Hippler* court cited a number of state and federal court cases that essentially followed the teaching of *Toussie*. *Id.* at 572. Although not expressly relying on *Toussie*, we engaged in the *Toussie* two-pronged analysis, noting nothing in the theft statute suggested the crime was a continuous one, nor was the crime of theft inherently continuing. *Id.* We noted under a continuing offense theory, the statute of limitations for theft would be extended indefinitely if the defendant maintained possession of the stolen property, a result the legislature could not have intended. *Id.* at 573.

Shortly after *Hippler*, we revisited the continuing offenses question in the context of the statute of limitations in *State v. Harrison*, 561 N.W.2d 28 (Iowa 1997) (per curiam). In *Harrison*, the defendant was charged with theft by exercising control over stolen property. *Id.* at 28.

The property was alleged to have been stolen more than three years prior to the filing of the criminal charge against Harrison. *Id.* The state argued that theft by exercising control over the stolen property was a continuing offense as long as Harrison possessed the property. *Id.* As a result, according to the state, the three-year general statute of limitations of Iowa Code section 802.3 was inapplicable. *Id.* The state urged us to overrule *Hippler* as wrongly decided. *Id.*

The *Harrison* court rejected the state's position. *Id.* at 30. Considering the offense of exercising control over stolen property, we held, consistent with *Hippler*, the offense was not a continuing one. *Id.* at 29. *Harrison* directly cited *Toussie*'s demanding two-pronged test for determining whether a crime was continuous. *Id.* Applying *Toussie* and citing *Hippler*, the *Harrison* court emphasized the statute involved did not expressly state it was a continuing offense and the nature of the crime did not compel us to treat the crime as a continuing offense. *Id.* *Harrison* recognized some jurisdictions employed a more generous view of the continuing offenses doctrine in the context of various crimes involving theft, but we emphasized "criminal limitations statutes are to be liberally interpreted in favor of repose and the doctrine of continuing offenses should be applied only in limited circumstances." 561 N.W.2d at 29 (emphasis omitted); *see also Toussie*, 397 U.S. at 115, 90 S. Ct. at 860. If we were to hold otherwise, the *Harrison* court observed, prosecutions could be brought many years after the original taking, involving stale evidence and putting defendants in the position of not being able to obtain their own evidence for a proper defense. 561 N.W.2d at 29.

We again considered the continuing offense extension in *Francois*, 577 N.W.2d 417. In *Francois*, the defendant was charged with the crime

of absence from custody more than eight years after she had failed to present herself at the Woodbury County jail. *Id.* at 417. The question was whether the charge was barred by the operation of the general statute of limitations of Iowa Code section 802.3. *Id.*

The *Francois* analysis began by reviewing the principles of *Harrison* and *Toussie*. *Id.* at 418. We emphasized the test of whether a crime is a continuous one "is strictly applied in order to limit the circumstances under which the continuing offense doctrine is utilized." *Id.* We repeated the language of *Harrison* that "criminal limitations statutes are to be liberally interpreted in favor of repose." *Id.* at 418 (quoting *Harrison*, 561 N.W.2d at 29).

The *Francois* court next applied the two-pronged *Toussie* test. *Id.* With respect to the language of the statute, we determined the legislature did not expressly state absence from custody was a continuing offense. *Id.* While the legislature had amended the statute to substitute "is absent" in place of "leaves," the court concluded this statutory change did not compel the conclusion the crime was a continuing offense. *Id.* at 418–19.

The *Francois* court then turned to the second prong of *Toussie*. *Id.* at 419. We canvassed the law related to escape crimes in general, noting when a defendant claims necessity as a defense to the charge of escape, the defendant has a continuing duty to turn themselves in after escaping—if the defendant fails to do so after having obtained a position of safety, the defense fails. *Id.* at 419–20. This, the court explained, indicated the offense of escape was a continuing offense. *Id.* at 420. The court surveyed cases from other jurisdictions and found they supported the conclusion that escape crimes were continuing offenses. *Id.* Then, after holding there was no material difference between an escape crime

and the crime of absence from custody, the court concluded the nature of the offense demonstrated the legislature's intent to make the crime a continuing offense. *Id.* at 421.

In *Francois*, we distinguished *Hippler* on the grounds that with respect to the crime of escape, "there is a continued danger to society when a person, whom the court has determined should be in custody, remains at large." *Id.* We further noted, unlike in *Hippler,* the duty of an escapee to return was a continuous duty. *Id.* Thus, the crime of escape was one of the limited circumstances under the *Toussie* test where a crime could be considered so inherently continuous that the legislature must have intended it to avoid the ordinary application of the general statute of limitations. *Id.*

In *Hippler*, 545 N.W.2d at 572, *Harrison,* 561 N.W.2d at 29, and *Francois,* 577 N.W.2d at 419–21, we examined the nature of the crimes categorically to determine whether the continuing offense exception to the statute of limitations was applicable. In *Hippler,* 545 N.W.2d at 572, and *Harrison,* 561 N.W.2d at 29, we considered whether the statutory crime of theft by exercising control over stolen property would amount to a continuing offense. Similarly, in *Francois,* 577 N.W.2d at 420, we considered whether escape crimes as a category were continuing offenses.

If the categorical test of *Hippler*, *Harrison,* and *Francois* is applied, we think it clear fraudulent uttering, passing, and redeeming and tampering with intent to influence are not continuing offenses. There is nothing in either statute which explicitly provides that they are. Further, the crimes are complete once the elements of the crime have occurred. Unlike classic continuing offenses such as kidnapping, bigamy, or

possession, the evil sought to be prohibited does not inherently continue on a daily basis.

The State argues, however, we should adopt a more expansive approach to the continuing offense doctrine. The State draws our attention to *State v. Diorio*, 83 A.3d 831 (N.J. 2014). In *Diorio*, the issue was whether a complex, ongoing scheme involving multiple individuals and businesses occurring over a period of time could be a continuing offense. *Id.* at 833. In *Diorio*, there was evidence the defendant created a fraudulent business with the intent to defraud others as long as possible. *Id.* at 843. In essence, the court found the defendant was acting through the fraudulent legal entity and its associates throughout the course of the life of the entity. *Id.* The court found the last act occurring in the scheme was the last date the defendant's fraudulent business harmed another by refusing to pay for shipped goods. *Id.* at 845. The State invites us to engage in a similar type of analysis here.

There is a debate in the courts regarding the proper interpretation of *Toussie* and the relationship between ongoing criminal conduct and applicable statute of limitations. *See generally* Annotation, *Possession of Stolen Property as Continuing Offense*, 24 A.L.R. 5th 132, 142–45 (1994). Some authorities appear to utilize an ongoing-criminal-conduct theory where the last criminal act occurs within the statute of limitations to reach back and save prior related criminal acts from the statute of limitations bar. *See United States v. Bustamante*, 45 F.3d 933, 942 (5th Cir. 1993); *United State v. Morales*, 11 F.3d 915, 917 (9th Cir. 1993). In these cases, the focus is not on an elements-of-the-crime test but instead on the nature of the conduct charged by the prosecutor. *See Bustamante*, 45 F.3d at 941–42 (finding defendant's actions amounted to a threat of continuing criminal activity during a four-year time period,

and thus, the crime of racketeering was not completed until the end of the time period); *Morales*, 11 F.3d at 917–18 (applying continuing-course-of-conduct theory to bribery payments for purposes of applying later sentencing guidelines to earlier conduct, but distinguishing this from a "continuing offense" in the *Toussie* sense).

The ongoing-criminal-conduct theory of continuing offenses was addressed in *United State v. Yashar*, 166 F.3d 873 (7th Cir. 1999). In *Yashar*, the defendant was charged with embezzlement of property of a government agency valued at more than $5000 during a qualifying one-year period. *Id.* at 875. Yashar was allegedly a "ghost" employee who over a period of years collected wages and health insurance from the City of Chicago for little or no work. *Id.* The defendant argued the $5000 threshold for the crime was not satisfied because many of the payments received by Yashar were outside the five-year statute of limitations. *Id.* The government responded by arguing the payments to Yashar were part of an ongoing course of conduct and because the last act fell within the five-year statute of limitations, the defendant was not entitled to dismissal on statute of limitations grounds. *Id.* at 876.

The *Yashar* court rejected the government's position, noting it would treat a continuing course of conduct or scheme the same as a continuing offense under *Toussie*. *Id.* at 877. The government's position, according to the court, in essence added a third prong to the *Toussie* test—namely, a crime would be considered continuous whenever the charged conduct is continuous in nature. *Id.* According to the *Yashar* court, this new factor would swallow the second factor of *Toussie* and depart from an approach that focused on the intent of the legislature in favor of a test based upon the prosecutor's charges and the language of the indictment in a particular case. *Id.*; *see also United States v. Jaynes*,

75 F.3d 1493, 1506 & n.12 (10th Cir. 1996) (noting "a continuing offense is not the same as a scheme or pattern of illegal conduct" and "[s]eparate offenses may be part of a common scheme without being 'continuing' for limitations purposes"); *United States v. Silkowski*, 32 F.3d 682, 689–90 (2d Cir. 1994) (distinguishing a continuing course of conduct from a continuing offense).

The approach of *Yashar* and its insistence on the elements test of *Toussie* has found some support among commentators. The *Toussie* test has been characterized as "correctly focus[ing] on the intent [of the legislature], given that the legislature creates and controls the terms of both statutes of limitations and criminal offense statutes." Boles, 7 Nw. J.L. & Soc. Pol'y at 253. By focusing on the conduct as reflected in the charging document, the charged conduct approach transfers power from the legislature to the prosecutor. *Id.* at 246. Further, it has been observed "[a] narrow approach to the continuing offense doctrine creates a brighter line between crimes that are continuing offenses and the crimes that are not." O'Shea, 35 W. New Eng. L. Rev. at 275.

Consistent with our prior precedent, we reaffirm the elements of the test for determining what a continuing offense is under Iowa Code section 802.7. Our caselaw simply points in a different direction than that advocated by the State in this case. *See Francois*, 577 N.W.2d at 418; *Harrison*, 561 N.W.2d at 29; *Hippler*, 545 N.W.2d at 573. Further, a charge-based approach has the potential of cutting too deeply into the generally applicable statute of limitations established by the legislature. *See Yashar*, 166 F.3d at 877. Finally, our caselaw teaches us to narrowly apply exceptions to the statute of limitations. *See Walden*, 870 N.W.2d at 845. We find no persuasive reason to depart from the teaching of these authorities.

2. *Application of continuing offense exception.* In examining the crime of fraudulently uttering, passing, and redeeming a lottery ticket in Iowa Code section 99G.36(1), we think it clear it is not a continuing offense. There is nothing in the text of section 99G.36(1) that suggests fraudulently uttering, passing, or redeeming is a continuing offense. The crime involves discrete acts that result in injury when the crime is complete and does not involve ongoing harm such as the classic continuing offenses of kidnapping, escape, or bigamy. Not surprisingly, crimes of fraud typically have been found discrete rather than continuous in nature. *See United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999); *United States v. Miro*, 29 F.3d 194, 198 (5th Cir. 1994); *United States v. St. Gelais*, 952 F.2d 90, 96–97 (5th Cir. 1992); *United States v. Niven*, 952 F.2d 289, 293 (9th Cir. 1991), *overruled on other grounds by United States v. Scarano*, 76 F.3d 1471, 1477 (9th Cir. 1996). As a result, we conclude the continuing offense exception of Iowa Code section 802.7 does not apply to the crime of fraudulently uttering, passing, and redeeming a lottery ticket.

We come to the same conclusion with respect to the crime of tampering under Iowa Code section 99G.36(2). The statute provides no indication that the legislature regarded the offense as a continuing offense. Like fraudulent uttering, passing, and redeeming, the crime itself is complete when discrete acts have been completed. While the effect of the crime may be ongoing, that is true in many common crimes such as theft or stealing. We therefore conclude the continuing offense exception is not available to the State on the tampering charge.

**F. Applicability of Ongoing Criminal Conduct.**

1. *Overview of ongoing criminal conduct.* Even though we reject the State's theory the offenses in this case amount to continuing

offenses, that is not the end of the matter. For even if the crimes involved here are not continuing offense for purposes of Iowa Code section 802.7, the State asserts because Shaw was attempting to redeem the winning ticket on January 17, 2012, the charges are timely without resorting to the continuing offenses exception.

2. *Application of ongoing criminal conduct.* We begin our discussion by considering whether a theory of ongoing criminal conduct has any applicability to Count II. In our view, the crime of tampering was completed by December 23, 2010. The elements of the offense are simply tampering with lottery equipment with intent to influence the results. *See* Iowa Code § 99G.36(2). There are no further elements to the crime. Under the State's theory of the case, when Tipton left the draw room on December 23, 2010, the offense was complete. He could have been arrested and charged the instant he left the draw room. The fact Shaw was seeking to redeem the winning ticket as late as January 17, 2012, has nothing to do with the elements of the crime. While the redeeming efforts of Shaw might be circumstantial evidence in support of the State's claim that Tipton did, in fact, tamper with lottery equipment, Shaw's activities do not serve to extend the statute of limitations for the completed offense.

Count I, however, alleges the defendant engaged in fraudulently passing or redeeming a lottery ticket between November 10, 2010, and January 17, 2012. And, on January 17, 2012, Shaw met with lottery officials in a last effort to convince them to pay the proceeds.

We think any claim that Tipton passed or attempted to redeem the lottery ticket as alleged in Count I occurring prior to January 15, 2012, is time barred. For example, any passing of the winning lottery ticket was clearly completed by December 29, 2011, when the winning ticket

was in the hands of lottery officials. To the extent the jury might have considered the passing alternative in Count I, they considered an alternative avenue of violating the statute that is time barred. Similarly, to the extent the jury might have relied on Johnston's attempt to redeem on November 10 or regarded the events of December 29, 2011, as an attempt to redeem, liability arising from these crimes is time barred as well.

But the redeeming allegation in Count I arising from Shaw's conduct on January 17 is not time barred. Thus, while the passing allegations of Count I fail as a matter of law, at least one of the alternative methods of finding liability under Iowa Code section 99G.36(1)—namely, fraudulent redeeming—is not time barred. The question thus arises as to the appropriate remedy where the State charges an individual under three alternative theories, but where two of the theories are time barred.

The State suggests that because evidence supports redeeming based on the actions of Shaw on January 17, 2012, the jury's guilty verdict on Count I may be affirmed. The problem with that theory, however, is in Iowa we have consistently held if a general verdict is returned in which one theory should not have been submitted and we cannot determine which theory the jury embraced, the verdict is flawed. *State v. Tyler*, 873 N.W.2d 741, 754 (Iowa 2016); *State v. Thorndike*, 860 N.W.2d 316, 321 (Iowa 2015); *State v. Hogrefe*, 557 N.W.2d 871, 881 (Iowa 1996). We think this approach applies in the context of a jury instruction that provides for three alternative methods of establishing an offense. Here, the jury could easily have found Tipton guilty based on fraudulently passing the lottery ticket, even though this statutory alternative was time barred.

On the other hand, Tipton suggests because some of the alternative theories were time barred, the entire charge is flawed. We do not agree with this proposition, either. We draw analogy to a multipronged offense where there is insubstantial evidence to support some but not all of the alternative theories. The appropriate remedy in these cases is a remand for a new trial on the viable theories remaining. *Hogrefe*, 557 N.W.2d at 881. We think the same concept applies here. In short, we find under the facts of this case, although the alternative theories of fraudulent passing or redeeming were outside the statute of limitations and are not continuing offenses, the question of whether Tipton is guilty of a violation of Iowa Code section 99G.36(1) based upon the January 17, 2012 redemption effort by Shaw is not time barred. *See United States v. Sunia*, 643 F. Supp. 2d 51, 72 (D.D.C. 2009) (holding dismissal not required "so long as some part of the criminal conduct alleged occurred within the timeframe of the applicable statute of limitations").

**G. Application of One-Year Fraud Extension of Iowa Code Section 802.5.**

1. *Overview of fraud extension caselaw.* We now turn to the second statute offered by the State to avoid the three-year statute of limitations in this case, the one-year fraud extension of Iowa Code section 802.5. In the alternative to the continuing offense and ongoing-criminal-conduct theories, the State urges this exception to the statute of limitations applies to Counts I and II in their entirety.

Our key case construing the one-year fraud extension of Iowa Code section 802.5 is *Wilson*, 573 N.W.2d 248. In *Wilson*, the defendants were charged with theft by taking and theft by deception stemming from filing a false insurance claim for a fictitious burglary in order to collect the

insurance proceeds. *Id.* at 249–50. The state charged the defendants more than three years after the defendants cashed the insurance check. *Id.* at 250. The district court dismissed the charges for falling outside the statute of limitations. *Id.*

On appeal, we considered whether fraud was a material element of the theft-by-taking charge and when discovery occurs for the purpose of triggering the fraud extension. *Id.* at 250–51. We noted Iowa Code section 802.5 was adapted from the Model Penal Code and a Pennsylvania statute has an identical provision. So we examined Pennsylvania caselaw to help us determine the meaning of "material element" in our statute. *Id.* at 251–52. We explained a Pennsylvania Superior Court case, *Commonwealth v. Eackles*, 428 A.2d 614 (Pa. Super. 1981), had concluded fraud is not a material element of a theft by taking. *Wilson*, 573 N.W.2d at 251. The *Eackles* court found

> if fraud is to be a material element of the offense charged, it would be necessary that it have some connection with the harm or evil sought to be prevented. . . . To convict of theft by unlawful taking, the Commonwealth is not required to prove that the taking was accompanied by fraud in the legal sense. Neither is fraud the harm or evil sought to be prevented by the language making theft by unlawful taking a crime.

428 A.2d at 619 (citation omitted). We agreed with the reasoning of the *Eackles* court, stating, "We think the same reasoning applies to our one-year extension for fraud crimes, and we adopt it." *Wilson*, 573 N.W.2d at 252.

The legal test for when discovery occurs, we explained, includes "a probable cause element and a due or reasonable diligence requirement." *Id.* We did not elaborate upon the nature of the probable cause element, though we did cite *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990), for the proposition "probable cause exists if the totality of the

circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been committed and that the person arrested committed it." *Wilson*, 573 N.W.2d at 253. We cited cases involving discovery in our civil rules, noting "the civil discovery exception to the statute of limitations incorporates an objective, due or reasonable diligence investigation requirement." *Id.* at 253–54. We therefore held "discovery" for purposes of section 802.5 occurs "when the authorities know or should know in the exercise of reasonable diligence that there is probable cause to believe that a criminal fraud has been committed." *Id.*

A threshold question that arises in this case is whether the term "fraud" or the elements of fraud must be expressly included in the statutory definition of the offense in order to fall within Iowa Code section 802.5. We think the two-step *Toussie* approach to continuing offenses also has applicability under the one-year fraud exception to the statute of limitations. First, does fraud or its derivatives expressly appear in the statute? Second, even if they do not, the second question is whether fraud is an inherent part of the crime and, as a result, we can confidently conclude the legislature intended the one-year extension of the statute of limitations to apply. There is authority for this proposition in other jurisdictions. *See Alvarez v. State*, 800 So. 2d 237, 238 (Fla. Ct. App. 2001); *State v. Stan's Contracting, Inc.*, 137 P.3d 331, 340 (Haw. 2006). We do not think magic words are required so long as the evil of fraud is inherent in the crime.

Another question is precisely when the clock starts to run under the statute. While it is clear under *Wilson* there is a "should have discovered" component of discovery under Iowa Code section 802.5, it is not clear whether the extension begins to run when there is probable

cause of a particular crime, or whether it begins to run only when there is probable cause that a specific offender committed the crime. 573 N.W.2d at 254. The language of the statute refers to discovery of "the offense," and not "the offender." *See* Iowa Code § 802.5. Yet, in *Wilson,* we quoted *Bumpus* and included a parenthetical on *Bumpus* indicating probable cause existed against a particular defendant. *Wilson*, 573 N.W.2d at 253. The State seizes on the *Bumpus* citation and zealously argues the one-year extension does not begin to run until the specific offender is discovered or, in the exercise of due diligence, should have been discovered.

There is little caselaw on the subject. Noted criminal procedure scholar Wayne LaFave, however, declares a statute of limitations commences upon "actual discovery" of the offense by authorities, which "starts when the crime is discovered even if the identification of the perpetrator is unknown." LaFave § 18.5(a), at 214; *see Taylor v. Cruikshank,* 148 P.3d 84, 91 (Ariz. Ct. App. 2006).

One case discussing this issue is *Zamora,* 557 P.2d 75. In *Zamora,* the Supreme Court of California noted if a bank robbery is committed in broad daylight but the criminals escape without being identified, the limitation period is not tolled. *Id.* at 98 n.33; s*ee also People v. Crossman,* 258 Cal. Rptr. 370, 372 (Ct. App. 1989) ("The identity of the perpetrator of the crime is not an element of the discovery issue."). Given the use of the term "the offense" in the statute, we do not think an individual perpetrator must be identified for the statute to begin to run.

On the other hand, we note the legislature has used the term "*the* offense" in Iowa Code section 802.5. (Emphasis added.) As a result, mere suspicion of general criminal wrongdoing of some kind does not trigger the statute. Instead, for the discovery element in section 802.5 to

be triggered, the State must know or in the exercise of reasonable diligence should have known there is probable cause to believe that "the offense" has occurred. By "the offense," we think it is clear it means the specific offense charged in the indictment or information.

Another question not answered in *Wilson* is how the "should have known" prong of Iowa Code section 802.5 actually operates. There is language in *Wilson*, for instance, which draws parallels to the civil rules of discovery. 573 N.W.2d at 253–54. Tipton seizes on this language and concludes the civil approach of inquiry notice applies under Iowa Code section 802.5. Under civil discovery, the statute of limitations begins to run from the date the putative plaintiff is on inquiry notice of "a problem." *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 352 (Iowa 1987). The civil statute of limitations runs from the date of inquiry notice and not from the date a reasonably diligent plaintiff would discover the actual cause of action. *Hook v. Lippolt*, 755 N.W.2d 514, 521 (Iowa 2008).

Obviously, the *Wilson* court drew an analogy to the approach to the statute of limitations in civil cases. 573 N.W.2d at 253–54. But this analogy was in reference to the larger question of whether there should be a "due diligence" aspect to discovery at all under Iowa Code section 802.5. *See id.* We do not believe our analogy to civil statutes of limitations was designed to extend to all issues related to due diligence, particularly in light of the statutory language of Iowa Code section 802.5 which provides the statute runs from one year from the date of discovery of "the offense." Further, we note the first prong of the *Wilson* test requires "probable cause," and not "reasonable suspicion" the offense has been committed. 573 N.W.2d at 254; *see State v. Jackson*, 90 P.3d 793, 801–02 (Ariz. Ct. App. 2004) (rejecting inquiry notice in context of criminal statute of limitation utilizing "discovery of the offense"

language).  We think the best view of Iowa Code section 802.5 is the statute begins to run on the date the State either has actual knowledge, or in the exercise of reasonable diligence should have discovered, the offense.

Finally, there is a question of the role of judge and jury in assessing statute of limitations questions.  We have had no occasion to expressly consider the proper role of judge and jury in a criminal case involving questions of due diligence under Iowa Code section 802.5.  In the civil context, however, we have held factual questions surrounding the application of the civil discovery rule raised questions for the jury.  *Frideres v. Schiltz*, 540 N.W.2d 261, 267 (Iowa 1995).  Our approach to due diligence in statute of limitations questions in civil cases is consistent with authorities in a number of other jurisdictions.  *See, e.g., Schillner v. H. Vaughan Clarke & Co.*, 134 F.2d 875, 879 (2d Cir. 1943); *McLendon v. Georgia Kaolin Co., Inc.*, 837 F. Supp. 1231, 1242 (M.D. Ga. 1993); *Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980); *Ruebeck v. Hunt*, 176 S.W.2d 738, 740 (Tex. 1943).

In *Wilson*, however, we noted the question of when the theft was discovered was a question of fact and because the district court made no factual determination, a remand to the district court was necessary.  573 N.W.2d at 254.  This language arguably implies factual questions related to discovery under Iowa Code section 802.5 are questions for the court.

LaFave adopts a binary approach to factual issues involving statute of limitations problems in criminal cases.  LaFave § 18.5(a), at 216.  He opines while the jury determines whether a crime was committed within the statute of limitations, "it is for the court to determine by a preponderance of evidence whether certain facts (e.g. defendant's purported 'fleeing from justice') have affected what the time

limit is." *Id.* LaFave's view draws support from a number of federal cases. *Id.* at 216 n.35; *see United States v. Florez*, 447 F.3d 145, 150 (2d Cir. 2006); *United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998); *United States v. Marshall*, 856 F.2d 896, 901 (7th Cir. 1988); *United States v. Gonsalves*, 675 F.2d 1050, 1052 (9th Cir. 1982).

The question has been considered by courts in Pennsylvania. In *Commonwealth v. Dunnick*, the commonwealth sought to toll the statute of limitations by invoking an exception to the statute which extended the time for prosecuting a defendant who had concealed his whereabouts. 202 A.2d 542, 545 (Pa. 1964). The district court held the commonwealth had failed to prove the defendant had concealed his whereabouts and dismissed the claim on statute of limitations grounds. *Id.* at 546. The *Dunnick* court reversed, holding factual issues related to the statute of limitations were questions for the jury. *Id.*

Following *Dunnick*, *a* Pennsylvania court decided *Commonwealth v. Groff*, a case of interest because of its procedural aspects. 548 A.2d 1237 (Pa. Super. Ct. 1988). In *Groff*, there was a factual question regarding whether the defendant committed the charged offenses within the statute of limitations. *Id.* at 1243. The court noted under Pennsylvania law, a defendant must first raise the statute of limitations defense at pretrial, otherwise it is waived. *Id.* at 1245 n.8. The court held that "if the statute of limitations defense pose[d] a question of law," the district court could decide the question pretrial or at an appropriate time during trial. *Id.* If, however, the statute of limitations defense posed a question of fact, the court declared the judge should not decide the issue but should present it to the jury. *Id.* When the evidence that the statute of limitation had not run was unrebutted, however, the court

noted the trial judge may decline to submit the issue to the jury. *Id.* at 1247 n.10.

Some California courts have followed the approach of *Dunnick* and *Groff*. To these courts, a defendant may raise a statute of limitations claim in a pretrial motion, but the trial court may decide the issue only if the facts are undisputed. *People v. Le*, 98 Cal. Rptr. 2d 874, 880 (Ct. App. 2000). The pretrial motion raising a statute of limitations defense is thus "the functional equivalent to a motion for summary judgment in the civil context." *People v. Lopez*, 60 Cal. Rptr. 2d 511, 522 (Ct. App. 1997). A California court noted disputed questions, including the questions related to the discovery of the offense, are questions of fact for the jury and may not be resolved pretrial. *Cf. Zamora*, 557 P.2d at 93.

The Wisconsin Supreme Court embraced a somewhat different approach in *State v. MacArthur*, 750 N.W.2d 910 (Wis. 2008). In *MacArthur*, the state asserted the statute of limitations was tolled because the defendant was not a public resident of the state. *Id.* at 913. The defendant argued the district court should only perform a gateway function. *Id.* at 923. According to the defendant, if the state presented sufficient evidence to convince a jury beyond a reasonable doubt the defendant was no longer a public resident of the state, thereby tolling the statute, the matter should proceed to the jury. *Id.* The state urged the court to adopt an approach consistent with the federal courts. *Id.*

Citing LaFave, the *MacArthur* court held the question of whether there is a preponderance of evidence to support the tolling of the statute of limitations is a question for the court to decide. *Id.* at 923; *see* LaFave § 18.5(a), at 216. According to the court, the state must show pretrial by a preponderance of evidence that the charges are within the statute of limitations. *MacArthur*, 750 N.W.2d at 923. The jury, however,

determines "the date or date range of the charged offense beyond a reasonable doubt." *Id.* In other words, the court held, the jury determines if the acts giving rise to the criminal offense fell within the statute of limitations, but the applicable time period of the statute of limitations is determined by the court. *Id.*

The *MacArthur* court defended its approach by noting, among other things, the limitations issue is decided prior to trial, which thus prevents an untimely prosecution. *Id.* Further, according to the *MacArthur* court, because the question of whether a defendant was a public resident was not an element of the underlying crime, proof beyond a reasonable doubt was not required. *Id.* Finally, the court noted compliance with a statute of limitations is required for the court to have personal jurisdiction over the defendant, and jurisdictional questions typically pose a question of law for the court to decide. *Id.* at 923–24.

We conclude the best view is that offered by LaFave and supporting authorities, namely that the question of whether certain criminal conduct fell within the parameters of the statute of limitations is for the jury, but setting the parameters themselves is a question for the trial court. The elements required to invoke relief pursuant to the statute of limitations are not elements of the crime, which must be proved beyond a reasonable doubt, but preliminary questions regarding the scope of legislative grace provided by the statutes, which may be decided by a preponderance of the evidence. A question regarding the scope of a statute of limitations is akin to a question of jurisdiction in a criminal case, which ordinarily presents a question to be decided by the trial court in the first instance, and not by the jury. Our approach is consistent with *Wilson*, where we at least implied that factual

determinations regarding the scope of the statute of limitations were matters for the court to decide. 573 N.W.2d at 254.

2. *Application of one-year fraud extension to fraudulent passing and redeeming charge in this case.* We begin with the question of whether the crimes charged qualify as crimes subject to extension under Iowa Code section 802.5. Under our caselaw, fraud is a material element of a crime if the State is (1) required to prove fraud as an element of the crime *or* (2) the harm or evil sought to be prevented by the statute. *Wilson,* 573 N.W.2d at 252; *see also Eackles,* 428 A.2d at 619. Iowa Code section 99G.36(1) meets both tests—it contains an element of fraud, and in any event, fraud is the evil sought to be prevented by the statute.

Once the crimes are found to qualify for the one-year fraud extension, the next question is whether the State has met the necessary substantive requirements. In this case, the test under *Wilson* is whether the state had (1) probable cause to believe the crime had been committed prior to January 15, 2012, or (2) in the exercise of due diligence reasonably should have known probable cause was present. 573 N.W.2d at 254.

The district court determined the State did not have actual probable cause to believe the crime of fraudulent passing or redeeming had been committed until release of the video and audio recording of the purchase and subsequent identification of Tipton in October 2014. The court then considered whether the State had exercised due diligence or whether the State should have uncovered the crime at an earlier date. The court found the State had exercised due diligence, noting the withholding of evidence as an investigative tool was a common and reasonable practice.

We turn first to the question of whether the State actually had probable cause at an earlier date. Prior to January 15, 2012, the lottery unquestionably knew Johnston had knowledge of the identification numbers on the winning ticket, Johnston did not purchase the ticket, and the winning ticket was physically turned over to the lottery by lawyers acting on behalf of a Belizean trust whose representatives steadfastly refused to identify the purchaser. Nondisclosure of the purchaser was thus more important to the trust than a payment of $16.5 million.

At this point, did the State have probable cause to believe the fraudulent passing or redeeming provisions of Iowa Code section 99G.36(1) had been violated? There was, of course, actual suspicion, and the lottery—prudently as it turned out—contacted DCI and did not pay the proceeds in light of its suspicions. But did the suspicion arise to probable cause to believe Iowa Code section 99G.36(1) had been violated?

We think the answer to this question is yes. By January 2012, the State knew it had probable cause to believe *someone* was attempting to be paid who was not entitled to the proceeds. That is the most likely explanation behind why the holders of the ticket refused to disclose the owner. The likelihood the undisclosed purchaser was not a qualified purchaser and the attempt to redeem the ticket was a fraudulent attempt to obtain an illegal payment was very high. While there might conceivably be innocent explanations, probable cause does not require certainty. *Illinois v. Gates*, 462 U.S. 213, 246, 103 S. Ct. 2317, 2336 (1983) ("[P]robable cause does not demand the certainty we associate with formal trials."). Instead, "only the probability . . . of criminal activity" is enough. *Spinnelli v. United States*, 393 U.S. 410, 419, 89 S. Ct. 584, 590 (1969), *abrogated on other grounds by Gates*, 462 U.S. at

238, 103 S. Ct. at 2332. By January 2012, the State knew someone was probably seeking to fraudulently redeem the ticket through the artifice of a Belizean trust and nondisclosure of the purchaser.

3. *Application to tampering charge.* We begin by considering whether tampering is the kind of crime subject to the one-year fraud extension of Iowa Code section 802.5. The State did not specifically have to prove fraudulent intent as part of the element of the crime, as the jury instructions show. But the crime of tampering with lottery equipment with intent to influence the outcome of a game amounts to an attempt to fraudulently win the prize. While "fraud" is listed as one of the methods a person may use to influence the winning of the prize and this method was not submitted to the jury, all of the other methods of violating the tampering statute involve the goal of obtaining a lottery payout through what is in essence a misrepresentation or omission of material fact. The purpose of the lottery is to be random and not give any individual the ability to influence the outcome in their favor. Influencing the outcome through "tampering" is to commit a fraud on the State as the operator of the lottery. We therefore conclude the one-year fraud extension of the statute of limitations in Iowa Code section 802.7 is available when the crime charged is tampering under Iowa Code section 99G.36(2).

Because tampering is within the scope of Iowa Code section 802.7, the next question is whether the prosecution commenced within the extended period of time afforded by the statute. That question requires a determination of when the state "discovered" or "should have discovered" there was probable cause *the crime of tampering* had been committed under Iowa Code section 99.36(2). The State did not have actual knowledge of probable cause of tampering until Tipton was identified in

October of 2014. The question remains, however, whether the State exercised due diligence in investigating the crime.

The district court concluded the State did exercise due diligence in its investigation. If the district court is correct, the State was entitled to the one-year extension of the statute of limitations running from October 2014 and the tampering charge would be timely.

On this question, the district court held a hearing on April 3, 2015. At the hearing, DCI agent Anderson testified that, as the elimination of Johnston as a real purchaser of the winning ticket demonstrates, withholding evidence such as the video and audio recording is a legitimate law enforcement tactic that assists in the culling of leads and suspects. Once the trail from Johnston ran cold in Houston and the ordinary three-year statute of limitations approached, Anderson testified that the State released an edited version of the video and audio recording.

It is true, as pointed out by Tipton, that the investigation did not proceed rapidly. According to the minutes of testimony, Johnston was identified in November 2011. Yet, Johnston was not interviewed in Quebec until August 2013, a year and nine months later. Anderson testified that the Royal Canadian Mounted Police first gave the State information about the wrong Phillip Johnston, that some of the information obtained from Canadian authorities was in French, and that the federal government asked for all contact with the Canadian government cease until an elaborate application form was completed. In addition, the minutes reveal the State attempted to work out an immunity agreement with Johnston. Finally, Anderson—the DCI agent investigating the matter during most of the applicable time period—had an open caseload of many files, including three homicides, cases

involving sexual assault and escape, and dozens of voter fraud cases assigned to him in 2012.

Once Johnston was interviewed, the minutes of testimony indicate the State learned Johnston had been contacted by Sonfield and Rhodes regarding the winning lottery ticket. It took the State an additional eight months from the time of Johnston's interview in August 2013 to travel to Houston in June 2014 in an unsuccessful attempt to interview them. The record does not explain why it took the State eight months to follow up on the Johnston lead.

Tipton also suggested that false claims regarding the winning ticket came in prior to expiration of the one-year period from December 29, 2010, for purchasers to claim prizes. But Anderson testified that false claims continued to roll in even after the deadline for redeeming winning tickets had passed.

We have stated that one of the important purposes of the due or reasonable diligence requirement in the fraud extension of the statute of limitations is "to discourage inefficient or dilatory law enforcement." *Wilson*, 573 N.W.2d at 254. Additionally, we have cited with approval an observation by the United States Supreme Court that statutory deadlines "have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *See Walden*, 870 N.W.2d at 845 n.1 (quoting *Toussie*, 397 U.S. at 114–15, 90 S. Ct. at 860).

In determining whether the State has acted with due diligence, we must consider the nature of the offense. An effort to unlawfully obtain millions of dollars in lottery winnings is a serious crime. Multistate lottery funds provide a significant source of revenue for the participating states. Such revenues are dependent upon the integrity of the lottery

program. The importance of maintaining the integrity of the lottery is emphasized in Iowa Code chapter 99G. Iowa Code section 99G.2(3) stresses that ensuring that the lottery "is operated with integrity" is one of the purposes of the statute. Further, the board of directors is directed to take any and all actions necessary to ensure "the integrity of the lottery." *Id.* § 99G.9(3)(*j*). Finally, there can be no question of the moral culpability of an offender attempting to swindle the lottery. In its investigation, the State must act with due diligence in light of the seriousness of the crime in order to avail itself of the one-year extension of the statute of limitations.

The record shows the State encountered some unexpected obstacles that reasonably delayed its investigation for a brief period of time. Yet, these obstacles fail to account for the full length of the delay between the identification of Johnston in November 2011 as the claimant of the ticket and the release of the convenience store video in October 2014, almost three years later.

There are three time gaps that are not fully explained on the record before us. The first is the year and nine month gap between when the State learned that Johnston claimed to have the winning ticket, in November 2011, and when investigators interviewed Johnston in Canada, August 2013. The record demonstrates that the Canadian Royal Mounted Police identified the wrong Phillip Johnston, causing what Anderson described as a two-month delay. Some documents were apparently received in French from Canadian authorities, but we do not know what these documents were or how they caused delay in the investigation. We know that the United States government asked the State to complete an elaborate form before continuing discussions with Canadian officials, but we have no idea what was involved or how long it

took to resolve that problem. Finally, it took some time, perhaps, to negotiate an immunity agreement with Johnston, but that seems like a fairly simple matter involving days, not weeks. We do not find evidence in the record to support an assertion that these events reasonably account for the year and nine month delay in interviewing the key witness sufficient to show due diligence. *Cf. State v. Taylor*, 881 N.W.2d 72, 77 (Iowa 2016) ("[O]ur precedents also disfavor using generalities in establishing good cause."); *State v. Winters*, 690 N.W.2d 903, 909 (Iowa 2005) (holding "bare assertion" that need to complete deposition showed good cause for exceeding speedy trial deadline insufficient).

The record also lacks any explanation at all for a second gap, namely, why it took investigators eight months after they interviewed Johnston to travel to Texas to attempt to interview Sonfield and Rhodes in June 2014. The State made no effort to explain this eight-month delay.

We also do not find the State showed it was diligent during a third gap—the State released the convenience store video in October 2014, approximately four months after reaching a dead end with Sonfield and Rhodes. At trial, investigators offered that they had technical difficulties figuring out how to release the video online. A generalized assertion of technical difficulties, without more, is insufficient to show due diligence in pursuit of a serious crime.

We note the State offered evidence of the number of cases that Johnston was assigned to work on between November 2011 and the release of the video. Anderson testified he was assigned, among other things, a number of voter fraud cases in October 2012, which delayed his other investigations. We have repeatedly held that ordinary court congestion does not establish good cause for a speedy trial violation. *See*

*Taylor*, 881 N.W.2d at 77; *State v. Bond*, 340 N.W.2d 276, 279 (Iowa 1983). We think this is analogous to the question of investigatory due diligence. It is possible for there to be extraordinary situations when investigators' other priorities might show that the State proceeded with due diligence. In those cases, the State must provide evidence that such a situation rises above the normal demands on an investigator's time. Otherwise, the State's busy workload could operate to significantly extend the statute of limitations for fraud cases.

Finally, we observe the generalization that law enforcement often withholds evidence as an aid to the investigation of a case does not automatically lead to a finding of due diligence. Anderson testified that he wanted to release the video once the Houston trip was unsuccessful and the Johnston trail was cold. Thus, for statute of limitations purposes, the question is whether the State's effort to develop the case reflected due diligence.

There were, of course, other generalizations. There were apparently a number of false claimants, particularly prior to the expiration of the one-year period to redeem a winning ticket but also thereafter. But there was no showing that the false claims took much time after Johnston was identified in November 2011. It took over three years for the trail to run cold when that point could have been reached by completing two simple tasks, interviewing Johnston in Quebec and traveling to Houston to attempt to interview Sonfield and Rhodes. Certainly the State has the burden of showing why it took three years to accomplish these simple tasks. The State has managed to throw up some sand, but not much more.

Because the State did not show that it pursued its investigation of the lottery ticket with due diligence, the State is not entitled to the one-

year fraud extension on the tampering charge. As a result, the tampering charge in Count II of the information should have been dismissed.

**III. Evidentiary Ruling Related to Exclusion of Evidence Regarding Tampering After 2010.**

**A. Introduction.** Tipton claims the district court erred in refusing to allow him to introduce evidence that the RNG lottery equipment was not tampered with in 2011 and 2012. Although this evidentiary question has direct relevance to the tampering charge in Count II, it also relates to the fraudulent redeeming aspect of Count I which we have determined was timely filed by the State. Because this question may arise on retrial, we address the issue in this appeal.

**B. Standard of Review.** Evidentiary rulings are generally reviewed for abuse of discretion. *State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003); *State v. Spargo*, 364 N.W.2d 203, 209 (Iowa 1985). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Buenaventura*, 660 N.W.2d at 50 (quoting *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001)); *accord State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012). If we find an abuse of discretion, we will only reverse if prejudice is shown. *Buenaventura*, 660 N.W.2d at 50; *State v. Windsor*, 316 N.W.2d 684, 688 (Iowa 1982).

**C. Positions of the Parties.** With respect to the rejected evidence, Tipton sought to introduce that no evidence of tampering was discovered on 2011 and 2012 RNG computers. Tipton argues the State had sought to prove Tipton's tampering by investigating these later used computers. This evidence, Tipton asserts, is just as relevant to tampering on the 2010 RNG computers as if the State's investigation had

showed the 2011 and 2012 RNG computers *did* show evidence of tampering.

The State argues evidence showing that no tampering was discovered on the 2011 and 2012 RNG computers is wholly irrelevant. The fact the 2011 and 2012 RNG computers were not tampered with says nothing on whether it is more or less likely the 2010 RNG computers were tampered with for the purposes of the December 29, 2010 draw.

**D. Discussion.** The State alleged, and the other evidence tended to show, any scheme to rig the Hot Lotto and collect the prize was focused on the December 29, 2010 draw date. There was no allegation, nor evidence in the record, anyone intended to or in fact tampered with the RNG computers used after that date. The State did not allege that any trace of the method used to tamper with the RNG computers—a self-destructing rootkit—would have been somehow carried over to the new computers. Any evidence, therefore, the 2011 and 2012 RNG computers had or had not been tampered with, would be irrelevant. *See* Iowa R. Evid. § 5.401 (2015) (stating relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); *id.* § 5.402 ("Evidence which is not relevant is not admissible."); *accord Briner v. Hyslop*, 337 N.W.2d 858, 869 (Iowa 1983).

Tipton asserts the State would have sought to introduce evidence of tampering on the 2011 or 2012 RNG computers if evidence of such tampering existed. Perhaps so. But the lack of evidence of such tampering in 2011 and 2012 has little probative value on the question of whether Tipton engaged in the discrete act of tampering on November 10,

2010, as the State alleged. We cannot find the district court abused its discretion by excluding this highly attenuate and remote evidence.

## IV. Evidentiary Ruling Related to Houston Investigation.

**A. Introduction.** Tipton argues the district court erred in allowing the State to introduce evidence into the record that Johnston cooperated with law enforcement authorities when interviewed in Canada. He further cites error in allowing the State to offer evidence that when DCI agents traveled to Houston to attempt to interview Sonfield and Rhodes, they avoided the agents and refused to be interviewed. Tipton's contemporaneous objections at trial to the introduction of this evidence were based on relevance and unfair prejudice under Iowa Rule of Evidence 5.403. Because this evidentiary question may arise again on retrial of the surviving redeeming charge in Count I, we consider it as part of this appeal.

**B. Standard of Review.** The district court rulings on relevance of evidence are reviewable for abuse of discretion, as are challenges to the admission of evidence under Iowa Rule of Evidence 5.403. *State v. Sinclair*, 582 N.W.2d 762, 764 (Iowa 1998); *State v. Sallis*, 574 N.W.2d 15, 16 (Iowa 1998). "An abuse of discretion occurs when the court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Buenaventura*, 660 N.W.2d at 50 (quoting *Rodriquez*, 636 N.W.2d at 239).

**C. Discussion.** On the objection raised at trial, we see no reversible error. Testimony that Johnston cooperated with authorities tends to suggest he was not a guilty party but was a mere conduit in a fraudulent scheme. Eliminating Johnston as the mastermind of the scheme to defraud the lottery was certainly a relevant goal for the State. We cannot say the district court erred in declining to exclude the

evidence on relevance grounds. Nor do we find the prejudicial effect of this relatively mild evidence clearly outweighed its probative value under Iowa Rule of Evidence 5.403.

We also think the district court did not abuse its discretion in declining to exclude testimony that Rhodes and Sonfield did not cooperate with the investigation on relevance and rule 5.403 grounds. The evidence showed that shortly after purchasing the winning lottery ticket, Tipton traveled to Houston. He did not reveal his business and personal association with Rhodes to DCI investigators. Tipton was in close phone contact with Rhodes on November 10, 2010, the day Tipton entered the draw room and had the opportunity to tamper with the RNG equipment and on December 23, 2010, the day Tipton bought the ticket.

The evidence further showed that investigators tried to contact Rhodes and Sonfield in connection with the lottery ticket. An investigator from the lottery testified he tried to contact Rhodes and Sonfield in Texas. The investigator said he went to Sonfield's office and made phone calls, but was not able to reach him. DCI investigator Anderson testified that he spoke with Sonfield's secretary and a Texas Ranger in an effort to reach him. Neither Rhodes nor Sonfield would return Anderson's phone calls.

We do note Tipton asserted in a motion in limine that the above testimony amounted to backdoor hearsay. We recently considered a claim of backdoor hearsay in *State v. Huser*, ___ N.W.2d ___ (Iowa 2017). Once the evidence came in, however, the only objection raised was relevance and rule 5.403. As a result, we do not address the backdoor hearsay issue in this appeal.

**V. Sufficiency of the Evidence of Fraudulent Redeeming.**

**A. Introduction.** No person may be convicted of a crime without substantial evidence to support the verdict. *See Tyler,* 873 N.W.2d at 746–47. That means a person may not be convicted based upon mere suspicion or conjecture. *State v. Schlitter,* 881 N.W.2d 380, 389 (Iowa 2016); *State v. Geier,* 484 N.W.2d 167, 171 (Iowa 1992).

Yet, direct evidence of guilt is not required. The law does not distinguish between direct evidence and circumstantial evidence of a crime. *State v. Vaughan,* 859 N.W.2d 492, 497 (Iowa 2015). A defendant may be convicted solely on circumstantial evidence if it is sufficiently compelling to convince a judge or jury of the defendant's guilt beyond a reasonable doubt.

**B. Standard of Review.** We review challenges to the sufficiency of evidence for correction of errors at law. *State v. Williams,* 695 N.W.2d 23, 27 (Iowa 2005). We will uphold a verdict if it is supported by substantial evidence. *State v. Quinn,* 691 N.W.2d 403, 407 (Iowa 2005). Evidence is substantial when a rational trier of fact would be convinced the defendant is guilty beyond a reasonable doubt. *State v. Serrato,* 787 N.W.2d 462, 465 (Iowa 2010). We view the evidence in the light most favorable to the State, "including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Williams,* 695 N.W.2d at 27 (quoting *Quinn,* 691 N.W.2d at 407); *accord State v. Sutton,* 636 N.W.2d 107, 110 (Iowa 2001). In our review, however, we must consider all the evidence in the record, not just the evidence supporting guilt. *State v. Torres,* 495 N.W.2d 678, 681 (Iowa 1993).

**C. Discussion.** As a starting point, we think there is substantial evidence to support the State's position that Tipton purchased the lottery

ticket. Tipton's lawyers cross-examined the identifying witnesses, of course, and offered testimony from family members that the person in the convenience store video and audio recording was not Tipton. But, these forays into the evidence only affect the weight of the evidence. A jury was entitled to find, based on the evidence presented, that Tipton was the purchaser.

If a reasonable jury concludes Tipton purchased the lottery ticket, the rest of the State's case falls in place. Although Tipton purchased the winning lottery ticket, he could not personally claim the prize. Indeed, because he had purchased the ticket, Tipton must have known no lawful prize could be awarded to its holder. As noted by one of the State's witnesses, Tipton had 16.5 million reasons to figure out how the prize might be claimed without revealing the unlawful nature of the claim. In order to do so, a reasonable jury could conclude beyond a reasonable doubt he must have been the wizard behind the curtain of the Belizean trust that sought to convert the winning ticket into cash without disclosing the fact that the purchaser was a disqualified individual.

And, although Count II has been dismissed, the evidence relevant to Count II also supports the redeeming charge in Count I. A reasonable jury could conclude evidence that Tipton tampered with the lottery equipment supported the State's claim that he sought to fraudulently redeem the winning lottery ticket.

There is no question that substantial evidence Tipton had an opportunity to install a rootkit means a rational jury could find a rootkit was in fact installed. Similarly, substantial evidence showing it is possible to create an impossible to detect rootkit and evidence Tipton had the knowledge to do so means a rational jury could find Tipton in fact created such a rootkit.

There is also evidence there was a problem with the security video in the RNG computer room at MUSL. A jury could find this evidence significant, given the testimony Tipton had access to the security video system as a security expert for MUSL. Interestingly, video from November 13, 2010, displays no such problem. The problem with the video makes it impossible to tell what Tipton did in the RNG computer room. We also have the testimony from the MUSL employees who were in the room with Tipton—the employees did not observe Tipton do anything suspicious, but they also trusted Tipton implicitly with lottery security and were not watching him closely.

Additionally, we have the evidence that the 2010 RNG computers were retired and completely wiped prior to some point in 2011. A reasonable jury could infer Tipton, as the IT security expert for MUSL, must have known this would occur and planned his tampering to occur when there would be the least possibility for detection. The so-called "self-destructing rootkit" would not, therefore, have had to self-destruct completely. Such a rootkit would simply have had to remove itself well enough not to be detected by MUSL's routine security checks—lottery security experts testified at trial that at the time of a draw MUSL would check a digital security signature called a "checksum" to ensure the RNG computers had not been tampered with, but would not conduct more detailed security checks. This rootkit would thus not need to withstand the barrage of investigation which would occur if lottery officials suspected tampering.

All in all, we find there is substantial evidence to submit the surviving redeeming claim to the jury. There was substantial evidence Tipton purchased the winning ticket, he had extensive computer knowledge, he had access to the lottery facility at a key time, he

ultimately succeeded in tampering with the machines, and he must have been behind the effort of Shaw to redeem the ticket as late as January 17, 2012. On this record, there is substantial evidence to allow a reasonable jury to connect the dots and find Tipton guilty of fraudulent redeeming in the surviving portion of Count I.

## VI. Jury Instructions Related to Statute of Limitations.

Tipton proposed the district court allow the jury to determine whether the State had brought the charges consistent with the applicable statutes of limitations. Specifically, Tipton sought to have the jury determine whether the State proceeded with due diligence sufficient to trigger the statute of limitations exception of Iowa Code section 802.5. The district court, however, refused to give the instruction on the ground that statute of limitations questions were for the court. Because we agree with the district court on the issue, there was no error in refusing to give Tipton's proposed instructions.

## VII. Jury Instruction No. 5 Related to Evidence.

**A. Introduction.** Tipton challenges as inadequate Instruction No. 5 dealing with consideration of evidence. Instruction No. 5 stated,

> In considering the evidence, make deductions and reach conclusions according to reason and common sense. Facts may be proved by direct evidence from a witness who claims to have actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is evidence about a chain of facts which show a defendant is guilty or not guilty. The law makes no distinction between direct evidence and circumstantial evidence. Give all the evidence the weight and value you think it is entitled to receive.

Tipton proposed additional language: "Facts are not proven by evidence requiring speculation or conjecture, or merely raising a suspicion."

**B. Standard of Review.** Alleged errors in the submission or refusal to submit jury instructions are reviewed for correction of errors at

law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). "Errors in jury instructions are presumed prejudicial unless" a lack of prejudice is shown beyond reasonable doubt. *State v. Ambrose*, 861 N.W.2d 550, 554 (Iowa 2015). We review jury instructions as a whole to determine whether the jury instructions correctly state the law. *State v. Hanes*, 790 N.W.2d 545, 559 (Iowa 2010).

**C. Positions of the Parties.** Tipton argues it was an error for the district court to deny adding the language "facts are not proven by evidence requiring speculation or conjecture, or merely raising a suspicion" to Instruction No. 5. Tipton argues his proposed instruction was a correct statement of the law and the district court only rejected the addition because it was not contained in the instructions of the Iowa State Bar Association.

The State argues Instruction No. 5 was legally sufficient because it was a model jury instruction. Further, the State argues Tipton failed to show his proposed added language was not communicated through the jury instructions as a whole. The concept that speculation, conjecture, and suspicion are not sufficient to support a conviction is abundantly clear when the jury instructions are read in full.

**D. Discussion.** Based on our review of the entirety of the jury instructions, we conclude the concept embraced in Tipton's proposed addition to Instruction No. 5 was adequately embraced in other instructions. *See Hanes*, 790 N.W.2d at 559 (Iowa 2010) (holding jury instructions must be read as a whole). Instruction No. 2 instructed the jury that whenever the State needed to prove something, there must be "evidence beyond a reasonable doubt." This is another way of saying that merely speculative evidence is insufficient. Further, Instruction No. 3 informed the jury that the presumption of innocence "requires you

to put aside all suspicion . . . and remains with the defendant throughout the trial unless the evidence establishes guilt beyond a reasonable doubt." Again, mere suspicion is insufficient.

Finally, Instruction No. 9 told the jury "reasonable doubt is one that fairly and naturally arises from the evidence or lack of evidence produced by the state." Viewing the instructions in their entirety, we see no error in the district court's refusal to provide the additional language suggested by Tipton.

## VIII. Jury Instruction No. 20 Related to Continuing Offense.

**A. Introduction.** Tipton claims the district court erred in submitting to the jury Instruction No. 20 which related to continuing offenses. Instruction No. 20 stated that under Count I, the State must prove, "On or about December 23, 2010 to January 17, 2012, the defendant passed a lottery ticket or attempted to redeem a lottery ticket."

**B. Position of the Parties.** Tipton asserts passing and redeeming are separate acts and, as a result, they constitute separate acts. Tipton claims the jury might not have been unanimous under the trial court's instruction.

The State maintains there was sufficient evidence to support both the "passed" and the "attempted to redeem" options. *See State v. Corsi*, 686 N.W.2d 215, 222 (Iowa 2004); *State v. Duncan*, 312 N.W.2d 519, 523 (Iowa 1981). The State sees the instruction as simply involving alternative methods of committing a single crime.

**C. Discussion.** We have concluded that Count I was not a continuing offense. Further, we have concluded that any "passing" alternative must have been completed prior to the expiration of the statute of limitations. As a result, by including an instruction including passing, the jury would have been allowed to convict the defendant based

on actions barred by the statute of limitations. As a result, the instruction was erroneous. On retrial, the district court should not use a similar instruction.

**IX. Jury Instruction Related to the Definition of "Attempt" in Instruction No. 24.**

**A. Introduction.** Tipton objects to the district court's Instruction No. 24 defining attempt. Instruction No. 24 provided, "To 'attempt' means to try to do something. It makes no difference whether the person accomplished what was attempted."

Tipton claims the instruction was inadequate to describe an attempt. Tipton's proposed instruction stated,

> The alternative charge in Count I of the Trial Information is an attempt to falsely redeem a lottery ticket with the specific intent to defraud. In order to commit an attempt, the defendant must specifically intend to defraud the Iowa Lottery by falsely redeeming a ticket and he must commit an act in furtherance of that intent beyond mere preparation. The act must reach far enough towards the accomplishment of the desired result to amount to commencement of the consummation. It must not be merely preparatory. While it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near it to stand either as the first or some subsequent step in a direct movement toward the commission of the offense after the preparations are made.

**B. Positions of the Parties.** Tipton maintains the district court's instruction on attempt was too cryptic. He notes his more elaborate instruction closely follows language extracted from *State v. Walker*, 856 N.W.2d 179, 187 (Iowa 2014). He claims under the district court instruction, a jury might conclude mere preparation is sufficient. According to Tipton the mere purchase of a lottery ticket might be regarded by the jury as "an attempt to redeem."

The State counters that the instruction was based upon the model instruction 200.18 of the Iowa State Bar Association. The State suggests the district court's instruction is consistent with *Walker*, 856 N.W.2d 179. The State criticizes Tipton's proposed instruction as far too verbose to provide the jury with a clear understanding of the issue. Further, the State notes the jury could not have equated the mere purchase of the lottery ticket with an attempt, because Instruction No. 19 stated "[i]t is not a criminal offense for a prohibited player merely to purchase a lottery ticket."

**C. Discussion.** We think the jury instruction on attempt was adequate. It expressed in plain language an attempt means that one must "try to do" the prohibited act. "Trial courts have a rather broad discretion in the language that may be chosen to convey a particular idea to the jury." *Stringer v. State*, 522 N.W.2d 797, 800 (Iowa 1994). The use of the phrase "to do" means more than mere preparation. We find no error in the instruction.

**X. Conclusion.**

For the above reasons, we hold Tipton's conviction on Count II for tampering with lottery equipment should be dismissed. With respect to Count I, we vacate Tipton's conviction and remand the case to the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED.**

All justices concur except Mansfield, J., who concurs in part and dissents in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I dissent in part. In my view, substantial evidence supports the district court's finding that the tampering charge was timely.

The majority correctly assigns responsibility to the trial court to determine the prosecution's time limit for prosecuting the case. *See State v. Wilson*, 573 N.W.2d 248, 254 (Iowa 1998). This determination is made by a preponderance of evidence, and we review it for correction of errors at law.

Iowa Code section 802.5 allows the State to commence prosecution "within one year after discovery of *the offense* by an aggrieved party." Iowa Code § 802.5 (2011) (emphasis added). I agree that as of January 2012, when Crawford Shaw withdrew any claim for payment despite having submitted the winning ticket, the State was on inquiry notice of a fraudulent passing or redemption charge. *See id.* § 99G.36(1). However, as of January 2012, the State had no inkling of criminal tampering with lottery equipment. *See id.* § 99G.36(2). Such suspicion did not arise until October 2014.

At the dismissal hearing, the State showed that it tried to get in touch with Phillip Johnston in Canada after the payment claim had been withdrawn. The State presented evidence that it took "several months" to hear back from Canadian officials. After an additional "two months" of work to get to the correct Phillip Johnston, the State was then required by the United States Department of Justice to fill out an application. After "several weeks" of further work it was determined that the application could not be completed. In the meantime, the State spoke to Johnston several times by phone, although these phone conversations proved unproductive. Ultimately, the State did visit with Johnston

personally in Canada in August 2013 after he agreed to be interviewed, even though the State had never completed the federally required application. This meeting produced for the first time information that the ticket had previously been in the hands of two individuals in Texas. In April 2014, Shaw confirmed this same information. A trip to Texas was then made in June 2014, and several days were spent unsuccessfully trying to talk to the two Texas individuals. Lacking any further leads, the State decided as a last recourse to post the video. It took some time to set up an appropriate vehicle for doing that, so the posting did not occur until October 2014. At that point, the defendant was identified.

On this record, a reasonable judicial factfinder could decide that charges were brought within a year after the offense should have been discovered by the State with reasonable diligence. *See* Iowa Code § 802.5. To put it another way, one could conclude there were no more than nine months of unjustifiable delay between January 2012 and October 2014.

It needs to be emphasized that Iowa Code section 802.5 also protects defendants by limiting any possible fraud extension to three years. *See id.*

For the reasons stated, I would affirm the district court's finding that the State commenced prosecution of the tampering charge "within one year after discovery of the offense by an aggrieved party." *Id.* In all other respects, I concur in the court's well-reasoned opinion.