# IN THE COURT OF APPEALS OF IOWA

No. 24-0575
Filed December 3, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOHN ANDREW ALCORN III,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.


        A defendant challenges his convictions for three counts of attempted murder and two counts of willful injury causing serious injury.  **AFFIRMED.**


        James S. Blackburn, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Joshua Henry, Assistant Attorney General, for appellee.


        Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

John Alcorn—along with his girlfriend's grandfather, Robert Lyons, and her mother, Rebecca Lyons—procured guns and fired numerous rounds from inside a Des Moines house toward a trio of visitors from Davenport.[1] After hearing testimony from the shooting victims and the shooters, among other witnesses, a jury convicted Alcorn of three counts of attempted murder and two counts of willful injury causing serious injury.[2] Alcorn challenges his convictions and sentence on four grounds. First, he argues the district court should have allowed him to bolster his justification defense with evidence that one of the victims had a history of domestic violence. Second, he contends it was a mistake to instruct the jury on the theory of aiding and abetting. Third, he alleges that the State failed to present sufficient evidence to support the verdicts. And fourth, he claims the court abused its discretion by imposing consecutive sentences.

Because Alcorn offers no legal authority for his evidentiary claim, we do not reach the merits of that issue. As to his second and third claims, the State offered ample proof that Alcorn aided and abetted Rebecca and Robert Lyons in the shootings. So the court properly instructed the jury and substantial evidence supported the verdicts. Finally, we find no abuse of discretion in the court's sentencing decision.

---

[1] In this opinion, we refer to the victims by their first names: Jerrel, Jeramie, and Stephanie. And for clarity's sake, we will use first names for Rebecca and Robert Lyons when we refer to them individually.

[2] The jury likewise convicted codefendants Rebecca Lyons and Robert Lyons. We also decide their appeals today. *State v. Rebecca Lyons*, No. 24-0598, 2025 WL ___ (Iowa Ct. App. Dec. 3, 2025); *State v. Robert Lyons*, No. 24-0640, 2025 WL ___ (Iowa Ct. App. Dec. 3, 2025).

### I.     Facts and Prior Proceedings

These crimes arose from a dispute between roommates, who were also drug dealers.   Alcorn moved into Jerrel's apartment in Davenport just before Thanksgiving 2021.   Jerrel was working full-time for a local company, but he also had a "side hustle" selling marijuana and ecstasy.   After Alcorn moved in, Jerrel recruited him to sell drugs, which allowed Alcorn to cover his delinquent rent payments.   But their arrangement did not work out as Jerrel expected.

In March 2022, Jerrel confronted Alcorn, accusing him of owing a drug debt of $400.   According to Jerrel, Alcorn agreed to buy "a pound of weed" for Jerrel to sell.   But when Jerrel came home from work on March 11, he found the apartment unlocked and he was missing cash, a pair of Jordan sneakers, and other belongings.   He suspected Alcorn had taken the property.   When Jerrel tried to reach his roommate, Alcorn ignored his calls.

Two days later, Jerrel confirmed his suspicion by text messaging with Alcorn's girlfriend, Keke.   She lived in Des Moines with her mother, Rebecca Lyons, and her grandparents, Robert and Vicki Lyons.   After leaving Davenport, Alcorn stayed at the Lyons' house.   And that's where Alcorn stashed what he took from Jerrel, according to Keke.   In a video call, Jerrel offered to pay Keke to retrieve his property.   During that call, Alcorn took Keke's phone.   By his own testimony, Alcorn was "furious" when he discovered Keke was talking to Jerrel.   His fury led to a series of text threats from Keke's phone, including: "N----- u dead I got fire u dead."   In another text from Keke's phone, Jerrel received an address for the Lyons' house.

After this exchange, Jerrel decided to travel to Des Moines to recover his belongings. He found a ride with his friend Jeramie and Jeramie's girlfriend, Stephanie. Stephanie was happy to drive; she just bought a Ford Escape and was a "huge fan of road trips." The trio left Davenport around 5:30 p.m. and arrived in Des Moines just before 9:00 p.m. Stephanie parked across the street from the address that Jerrel had for the Lyons' house.

Jerrel walked to the front door by himself. He rang the doorbell, which was equipped with a video camera that captured the events. That video showed Jerrel waiting patiently for someone to answer. When Robert came to the door, Jerrel explained in measured tones that he was there to talk to Keke or Alcorn. Jerrel told Robert that Alcorn "took his stuff" and that "if my stuff is here I would like to get my stuff back." Soon Rebecca stepped outside and said she was "armed to carry." She also said Alcorn left, which wasn't true.[3] She said that this was her parents' house and "shit can't be popping off over here." Jerrel assured her that he and his friends were unarmed.[4] Rebecca gave Jerrel her phone number, and she agreed to check on his belongings. During their exchange, Robert reappeared at the door carrying an M4Carbine rifle, while Rebecca pulled a pistol from her sweatshirt. In reaction, Jerrel hopped down from the stoop, hands in the air, reminding them that he was "not armed." Robert responded: "Well, we are all armed." Rebecca added:

---

[3] Rebecca testified that Alcorn told her that Keke had cheated on him and that "people were coming from Chicago to kill him."

[4] Jerrel didn't know Stephanie had an unloaded firearm in her purse. She had a license to carry and did not remove the gun during these events.

"We got M4s, we got AKs, we got everything. And we're ready to shoot up whoever comes over here."

After hearing news of their arsenal, Jerrel walked toward the Ford Escape, before noticing that he did not have Rebecca's number saved in his phone. He rang the doorbell again, stepped off the stoop, and waited. But instead of answering the door, Rebecca yelled out the window that the police were on their way. Jerrel replied "that's fine" but repeated that he "got scared and lost [her] number." Then, as Jerrel stood in the middle of the lawn, shots rang out.

At trial, Alcorn took responsibility for the opening salvo. But he told the jury that they were warning shots:

> So I don't know what was being said at the door, what was being said in the yard. I just know I kept on hearing Rebecca saying, "You need to leave, we're calling the police." Then I seen a revolver on the counter and I asked the grandmother, "Is this like Florida, stand your ground?" She confirmed it and said yes, and that's when I took the revolver and I shot two times.[5] I wasn't aiming at Jerrel, I aimed directly behind him.

Meanwhile, just before the shooting started, the grandmother, Vicki Lyons, called 911 to ask for help: "We've got some guys from Chicago down here, we were told they're coming down here to shoot my house up." She told the dispatcher that they had already rung the doorbell twice. She warned: "We're armed to the hilt, so if we want to have a gun fight. I'm telling you right now, this is what we're going to do." While she's still on the line, shots ring out and she told the dispatcher: "they're sitting outside my house, they're all fucking shooting man."

---

[5] The record does not support Alcorn's claim to firing only twice. Rather, the State's evidence suggested that he discharged all six rounds from a .356 revolver—out the same window where Rebecca had been calling to Jerrel.

By the time Alcorn started shooting, Robert had slipped out the back door and "stationed" himself at the corner of the house to "get to a better vantage point." From that vantage point, Robert emptied the thirty-round magazine of the M4 Carbine automatic rifle, before going back inside the house and firing another five rounds from a .45 caliber pistol. The last shooter was Rebecca. She discharged seven rounds from the same window with a nine-millimeter pistol. As the shooting subsided, Alcorn yelled from the window: "Sup n*****? I'm from Chicago. This is for real."[6]

The bombardment of bullets took a toll on Stephanie and Jeramie. Stephanie suffered gunshot wounds to her left shoulder, left hip, and neck. Her Ford Escape was riddled with bullet holes. Jeramie was shot in the chest and struggled to breath. At trial, the defendants stipulated that the shooting caused Jeramie and Stephanie serious injuries. Jerrel was uninjured.

When police responded to the chaotic scene, they secured six individuals who had been inside the Lyons' home, including Alcorn. Crime scene investigators seized eleven firearms from inside the house and collected dozens of shell casings from the guns that were fired. Rebecca told an officer that Jerrel "started opening fire" from Stephanie's vehicle. Alcorn and Robert also claimed in their police interviews that Jerrel and his companions fired first from across the street. At trial, Alcorn agreed that he lied to police about who shot first but blamed Robert for suggesting that narrative.

---

[6] In his testimony, Alcorn denied yelling that, but acknowledged he was the only person inside the house from Chicago.

The State charged Alcorn, as well as Robert and Rebecca Lyon, with three counts of attempted murder and two counts of willful injury causing serious injury. The jury found Alcorn guilty as charged. The court sentenced Alcorn to a prison term not to exceed seventy-five years with a mandatory minimum period of fifty-two and one-half years. He now appeals.

## II.    Analysis

### A. Did Alcorn waive his evidentiary claim by failing to cite any legal authorities in the argument section of his brief?

At trial, Alcorn tried to introduce evidence of Jerrel's convictions for domestic abuse assault.[7] Defense counsel argued that because his client knew of Jerrel's violent history, the convictions were relevant to Alcorn's justification defense. The court ruled that Alcorn could not use extrinsic evidence to impeach Jerrel and had not shown that the convictions were relevant.

On appeal, Alcorn contends that ruling was an abuse of discretion, citing several cases for the standard of review. *See*, *e.g.*, *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). But that's as far as his case law goes. Alcorn cites no legal authority in the argument division of this claim.[8] "A party forfeits an issue on appeal when the party fails to cite any authority in support of the issue." *State v. Jackson*, 4 N.W.3d 298, 311 (Iowa 2024); *see also* Iowa R. App. P. 6.903(2)(a)(8)(3) ("Failure to cite authority in support of an issue may be

---

[7] As the State points out, Alcorn's offer of proof did not establish that he knew about Jerrel's criminal history nor did it verify the existence of those convictions.
[8] His citation to Iowa Rule of Evidence 5.401 in the reply brief does not save him. *See Hills Bank & Tr. Co. v. Converse*, 772 N.W.2d 764, 770–71 (Iowa 2009) (declining to consider issue raised for the first time in reply brief).

deemed waiver of that issue."). Given Alcorn's waiver, we do not decide his evidentiary claim.

**B. Did the district court err by instructing the jury on aiding and abetting?**

In his second claim, Alcorn argues that State's evidence did not support a theory of aiding and abetting. Alcorn minimizes his own participation in the crimes by claiming that he "only fired two warning shots that day and neither warning shot struck any person," and he contends he "was not aware that the others were going to fire." The State counters that Alcorn "mischaracterizes the evidence."

Our analysis starts with the aiding-and-abetting statute.

> All persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense or aid and abet its commission, shall be charged, tried and punished as principals. The guilt of a person who aids and abets the commission of a crime must be determined upon the facts which show the part the person had in it, and does not depend upon the degree of another person's guilt.

Iowa Code 703.1 (2022).

The State charged Alcorn, Rebecca Lyons, and Robert Lyons, in a single trial information, alleging they committed the criminal offenses "individually, or by joint criminal conduct, or by aiding and abetting." At trial, the defendants objected to the jury instruction on aiding and abetting, contending that the State did not offer substantial evidence that Alcorn and the Lyons agreed to commit these crimes or encouraged each other to fire the shots. The court overruled the defense objection, explaining: "There remains the additional component of aiding and abetting, . . . that the crime can be approved and agreed to by active participation

in the crime. Here we have all three defendants by their own admission having shot firearms towards the alleged victims."

Alcorn renews his challenge to the aiding-and-abetting instructions. We review for correction of errors at law. *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). We may uphold a conviction on an aiding-and-abetting theory if the record includes substantial evidence that "the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission." *Id.* at 211 (citations omitted). While knowledge of criminal activity is crucial, neither knowledge nor presence at the scene is enough—standing alone—to prove aiding and abetting. *Id*. But we will consider Alcorn's "presence, companionship, and conduct" before and after the commission of these offenses to decide if it was proper to instruct the jury on aiding and abetting. *See id*. (finding that such evidence is "enough from which to infer a defendant's participation in the crime").

To undermine the State's aiding-and-abetting theory, Alcorn quotes testimony from Des Moines police officer Chase Lohnes, the lead detective. On cross examination, counsel asked the detective: "What evidence did you uncover that suggested John Alcorn, Ms. Lyons and Mr. Lyons got together and said, 'Here's what we're going to do. We're going to take these guys out.'" Detective Lohnes replied: "There is no evidence of that." The detective added, "There's no evidence to indicate that all three agreed upon anything."

But as the State notes, "Detective Lohnes was not the factfinder." And while the record contained no direct evidence of an express agreement among the defendants, a wealth of circumstantial evidence justified instructing the jurors on

aiding and abetting. *See State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (finding substantial evidence from which jurors could reasonably infer that Lewis aided and abetted the drive-by shooting).

It was undisputed that Alcorn was present at the house and in the Lyons' company before the shooting. In fact, Alcorn planted the seed with the Lyons that the visitors posed a violent threat. To that end, Robert told police that after Alcorn warned that Jerrel was on his way, they all thought "well, we've got guns too." And Robert placed the weaponry in accessible spots around the house. Indeed, Alcorn took a revolver from the kitchen counter, went upstairs, and unleashed the first gunfire out the window. While the Lyons continued firing rounds, Alcorn shouted out the window that he was "from Chicago" and the shooting was "for real." Then after the shooting, Alcorn joined with the Lyons to mislead the police by insisting that the visitors shot first and Alcorn, Robert, and Rebecca returned fire. When viewed in total, Alcorn's presence, companionship, and conduct before and after the shooting support instructing the jury on Alcorn's liability as an aider and abettor. *See Neiderbach*, 837 N.W.2d at 211 (approving aiding-and-abetting instruction when defendants were both present when the offense was committed and "colluded with each other" to explain what happened).

### C. Did the State offer substantial evidence to support the verdicts?

The heading on Alcorn's next claim is confusing. He contends: "The verdict is contrary to the law and the evidence. The Court should have sustained defendant's motions for acquittal." Those sentences conflate two standards. "Courts apply a different standard to motions for new trial than to sufficiency-of-the-evidence claims." *See State v. Sallis*, No. 17-1842, 2019 WL 325019, at *2

(Iowa Ct. App. Jan. 23, 2019); *see also State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016) (contrasting the two standards).

Despite that confusion, we read his analysis as challenging the sufficiency of the evidence, which we review for the correction of legal errors. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). We will uphold the guilty verdicts if they are supported by substantial evidence. *Id.* Substantial evidence exists when a rational jury would be convinced the accused is guilty beyond a reasonable doubt. *Id.* We review all relevant evidence in the light most favorable to the State. *Id.*

For the three counts of attempted murder, the jury instructions required the State to prove that Alcorn or someone he aided and abetted (1) shot a firearm at Jerrel, Jeramie, and Stephanie; (2) expecting to set in motion a force or chain of events that would have caused or resulted in death; (3) with specific intent to cause death; and (4) without justification. *See* Iowa Code § 707.11. The court also instructed the jury that they could infer specific intent to kill from use of a dangerous weapon (that is, a firearm) when its use was coupled with an opportunity to deliberate. For the two counts of willful injury, the instructions required the State to prove that Alcorn or someone he aided and abetted (1) shot Jeramie and Stephanie, (2) while intending to cause a serious injury, (3) which caused a serious injury, and (4) was without justification. *See id.* § 708.4(1).

Alcorn offers truncated arguments, with no legal authority, challenging the State's proof.[9] On the attempted-murder counts, he maintains "the evidence is

---

[9] As earlier stated, arguments on appeal with no legal authority are waived. *See Jackson*, 4 N.W.3d at 311. Although we need not address the merits of this issue, we briefly answer his claims.

clear that Alcorn only fired warning shots behind [Jerrel] without hitting him and that he had no intention to murder either [Jerrel, Jeramie, or Stephanie]." For willful injury, he insists the only way he can be found guilty is "through aiding and abetting."

Alcorn's arguments are unconvincing. The State presented strong evidence that he committed the crimes charged. At the jump, the jury could have found from the evidence that Alcorn fired more than two warning shots. The investigation revealed that Alcorn first shot toward Jerrel in the yard and then across the street where he was heading, in the direction of Jeramie and Stephanie. Whether Alcorn intentionally unloaded the revolver in an attempt to kill the visitors, or whether he was driven by panic or self-defense, are questions best left for the jury. *See State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991). As instructed, the jurors could infer the intent to kill from the codefendants' use of several dangerous weapons. What's more, the evidence supported the State's theory that Alcorn aided and abetted the Lyons in launching the barrage of bullets toward the victims. *See Neiderbach*, 837 N.W.2d at 211. Viewing the evidence in the light most favorable to the State, we decline to disturb the verdicts.

### D. Did the district court abuse its discretion by imposing consecutive sentences for Alcorn's three attempted-murder convictions?

To complete our review, we address Alcorn's sentencing challenge. *See State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002) ("We will not reverse the decision of the district court absent an abuse of discretion or some defect in the sentencing procedure."). Assessing whether the sentencing court abused its discretion doesn't mean second guessing that judge's thought process. *State v.*

*Damme*, 944 N.W.2d 98, 105–06 (Iowa 2020). Rather, we check to see whether the court chose the sentence for reasons that were "clearly untenable or unreasonable." *Id.*

Alcorn's three convictions for attempted murder each carried terms not to exceed twenty-five years with mandatory minimums of seventeen and one-half years. *See* Iowa Code §§ 902.3, 902.7, 902.9, 902.12. And his two convictions for willful injury causing serious injury required terms not to exceed ten years with five-year mandatory minimums. Under Iowa Code sections 901.5(9)(c) and 901.8, the district court ran his attempted-murder sentences consecutive to each other and concurrent with the willful-injury sentences. All told, Alcorn faced a prison term not to exceed seventy-five years with a mandatory minimum period of fifty-two and one-half years.

Alcorn now contends those consecutive terms were an abuse of discretion. He complains that his sentence was "unjust" because it was "three times as long as the sentence of the two codefendants who fired more shots, fired at individuals, as opposed to warning shots, and actually struck and injured two individuals while [he] did not shoot or injure any individual." [10]

At the sentencing hearing, the court explained its decision to treat Alcorn's conduct more harshly than that of his codefendants.

> Although all defendants fired shots in this matter, it is clear to the Court that had Mr. Alcorn not brought this situation to the Lyons' doorstep, the Lyons would not have become involved, and if Mr. Alcorn had not fired the first shots that night, it's highly unlikely that Mr. Lyons or Ms. Lyons would have fired shots.

[10] The court imposed concurrent sentences for both Robert and Rebecca Lyons, for terms not to exceed twenty-five years with a mandatory minimum of seventeen and one-half years.

The district court gave sufficient reasons for imposing consecutive sentences. *See State v. Pirie*, 18 N.W.3d 238, 250 (Iowa 2025) (requiring the sentencing court to state the reasons for the chosen sentence). The court considered all pertinent matters, including Alcorn's central role in the confrontation, his age, his character, and his chances of reform. *See State v. August,* 589 N.W.2d 740, 744 (Iowa 1999). The punishments imposed by the district court fit both the crimes and the individuals. *Id.* Resentencing is unnecessary.

## III. Summary

To recap, the State offered substantial evidence that Alcorn aided and abetted his codefendants in shooting the three victims. His actions amounted to attempted murder and willful injury resulting in serious injury. He forfeited his objection to the exclusion of evidence and failed to show an abuse of discretion in the imposition of consecutive terms for the attempted-murder convictions. Thus, we affirm his convictions and sentence.

**AFFIRMED.**